[No. 29301. *En Banc.* March 1, 1944.]

THE STATE OF WASHINGTON *on the Relation of G. D. Linn, Plaintiff*, v. THE SUPERIOR COURT FOR KING COUNTY, *Robert M. Jones, Judge, Respondent.*[1]

[1] Reported in 146 P. (2d) 543.

*Frank L. Walters* and *A. A. Booth,* for relator.

*A. C. Van Soelen* and *J. Ambler Newton,* for respondent.

*The Attorney General* and *Jess N. Rosenberg, Assistant, amici curiae.*

BEALS, J.—January 27, 1944, G. D. Linn, relator herein, on his own behalf and on behalf of his co-signers, filed with the clerk of the city council of Seattle a petition which he and 9,149 other persons had signed, each of whom by signing the petition asserted that he was a qualified voter of the city of Seattle. By the petition, the signers demanded that the city council submit to the voters of Seattle a proposed amendment to subdivision 14, § 18, Art.

IV, of the charter of the city of Seattle, the proposed amendment being set forth in the petition. The petitioners asked that the proposed amendment be submitted at the approaching municipal election to be held March 14, 1944. January 31st following, relator filed with the clerk his affidavit concerning the alleged genuineness of the signatures borne by the petition, which affidavit was by the clerk attached to the petition. This affidavit relator filed in purported compliance with Rem. Rev. Stat., § 8964 [P. C. § 695]. On the same day, the petition, together with relator's affidavit, came before the city council at a regular meeting, whereupon the council rejected the petition, in so far as the March 14th election was concerned, as not having been filed within the time required by law, directing, however, that the petition be placed on file.

February 3rd, relator commenced an action before the superior court of the state of Washington for King county, whereby he, as relator, asked for a writ of mandamus requiring the mayor of the city of Seattle and the members of the city council, all of whom were named as respondents to the proceeding, to grant the petition and take all necessary and proper steps looking toward the submission of the proposed charter amendment to the electors of the city of Seattle at the municipal election above referred to. An alternative writ of mandate having been issued, issue was joined thereon, and the action came on to be heard on its merits before the Honorable Robert M. Jones, one of the judges of the superior court.

A hearing was had, evidence was introduced, and after argument, February 10, 1944, an order was entered denying the writ and dismissing the proceeding. Thereafter, upon application to this court, certiorari was granted, and the record regularly filed herein by respondent. The matter was argued to Department Two of this court February 18th, and to the court sitting *En Banc* February 21, 1944, and was submitted to the court for final decision upon the record made herein, briefs filed, and the argument of coun-

sel. At the hearing before the court *En Banc,* a brief was filed by the attorney general as *amicus curiae.*

By the brief last referred to, attention of the court was called to § 10, Art. XI, of the constitution of Washington, which reads in part as follows:

"Corporations for municipal purposes shall not be created by special laws; but the legislature, by general laws, shall provide for the incorporation, organization, and classification, in proportion to population, of cities and towns, which laws may be altered, amended, or repealed. . . . Any city containing a population of twenty thousand inhabitants or more shall be permitted to frame a charter for its own government consistent with and subject to the constitution and laws of this state, and for such purpose the legislative authority of such city may cause an election to be had, at which election there shall be chosen by the qualified electors of said city fifteen freeholders thereof, who shall have been residents of said city for a period of at least two years, preceding their election, and qualified electors, whose duty it shall be to convene within ten days after their election, and prepare and propose a charter for such city. Such proposed charter shall be submitted to the qualified electors of said city, and if a majority of such qualified electors voting thereon ratify the same, it shall become the charter of said city, and shall become the organic law thereof, and supersede any existing charter, including amendments thereto, and all special laws inconsistent with such charter. Said proposed charter shall be published in two daily newspapers published in said city for at least thirty days prior to the day of submitting the same to the electors for their approval, as above provided. . . . Such charter may be amended by proposals therefor submitted by the legislative authority of such city to the electors thereof at any general election, after notice of said submission published as above specified, and ratified by a majority of the qualified electors voting thereon."

It appears that this constitutional provision was not called to the attention of the superior court at the time of the argument, nor was it referred to by the parties at the argument before the department of this court.

In the court below, relator contended that the proceed-

ing was governed by portions of chapter 186, p. 393, Laws of 1903 (Rem. Rev. Stat., §§ 8963-4-5 [P. C. §§ 694-5-6].), while respondents below contended that the statute referred to had been superseded by Laws of 1921, chapter 61, p. 179, as amended by Laws of 1923, chapter 53, p. 172. As above stated, the trial court ruled in favor of the respondents below, and dismissed the action.

Relator here contends that the trial court erred in holding that the act of 1921, as amended by the act of 1923, above cited, in so far as pertinent to the facts of this proceeding, superseded the act of 1903.

' Briefly stated, the difference between the acts, in so far as the proceeding before the superior court was concerned, is that by the act of 1903 the petition was timely filed, as under the act of 1903, the subject matter of such a petition as that here in question should be "submitted to the voters at the next regular municipal election occurring thirty days or more after said petition is filed." By the 1921 act, as amended by Laws of 1923, chapter 53, p. 174, § 6 (Rem. Rev. Stat., § 5148-2 [P. C. § 2120-7b]), it was provided that the governing board of any city, etc.,

". . . shall not less than forty-five (45) days before the date of any election to be held under the provisions of this act, certify to the election board a list of the offices to be filled at such election, and any such governing board, desiring to submit to the voters of such city, town, or district any proposition for their approval and adoption, or rejection, at any election to be held under the provisions of this act, shall require the clerk or secretary of such governing board to certify to the election board at least forty-five (45) days before the date of such election . . ."

In our opinion, the question presented in the case at bar is, at this date, controlled by the section of our state constitution above quoted, and, for this reason, consideration of the statutes above cited is unnecessary. We accordingly leave any question which may arise under those statutes for determination when presented.

Of course the question presents itself as to whether or not the words "legislative authority," as used in the sec-

tion of the state constitution above quoted, should be held to include the people acting in accordance with their right to initiate legislation pursuant to existing laws, so as to make the requirement of thirty days' notice applicable to legislation by way of charter amendments initiated by the people, as well as to that sponsored by a city council or other legislative body. .

■ Constitutional provisions should be construed so as to give effect to the manifest purpose for which they were adopted.

Section 1, Art. I, of the constitution of Washington, reads as follows:

"All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights."

"The fundamental purpose in construing a constitutional provision is to ascertain and give effect to the intent of the framers and of the people who adopted it. The court, therefore, should constantly keep in mind the object sought to be accomplished by its adoption, and the evils, if any, sought to be prevented or remedied. Effect should be given to the purpose indicated by a fair interpretation of the language used." 16 C. J. S., Constitutional Law, pp. 51-54, § 16.

"The object of construction, as applied to a written constitution, is *to give effect to the intent of the people in adopting it.* In the case of all written laws, it is the intent of the lawgiver that is to be enforced. But this intent is to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey ·it, and unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it." 1 Cooley, Constitutional Limitations (8th ed.), pp. 124-125.

Considering the purpose of the portion of the constitutional provision under discussion, in so far as the same deals with notice by publication of proposed amendments to a city charter, it is apparent that the purpose of the constitutional provision is to afford an opportunity for all voters to fa-

miliarize themselves with the terms of the proposed amendment (and, in the first instance, with the terms of the proposed charter itself), and, after consideration and discussion, enable themselves to vote intelligently upon the proposition. The necessity for such consideration is equally great regardless of the manner in which the proposition is submitted to the voters.

Throughout the section of the constitution, the words legislative authority are employed without any restrictive words or phrases, and without definition. No specific type of legislative authority is mentioned.

In the case of *Bronson v. Syverson*, 88 Wash. 264, 152 Pac. 1039, Ann. Cas. 1917D, 833, L. R. A. 1916B, 993, this court said:

"As we said on another occasion, it is a cardinal rule of construction that the language of a state constitution, more than that of any other of the written laws, is to be taken in its general and ordinary sense. The reason for the rule lies in the fact that its makers are the people who adopt it. Its language is their language, and words employed therein have meaning as the generality of the people understand them. *When, therefore, words are used in a constitution which have both a restricted and general meaning, the general must prevail over the restricted, unless the nature of the subject-matter or the context indicates that the limited sense was intended.*" (Italics ours.)

At the time of the adoption of the constitution by the electors of this state, several different types of municipal legislative authority were familiar to the common law of the United States. The town meeting of New England is a conspicuous example. The phrase used is as broad as any description could be, and should be held to include any legislative authority that may obtain in a particular city at the time the constitutional provision is invoked.

The government of cities has been the subject of many experiments. A mayor and city council, a board of aldermen, and commission and city manager type of government are in operation. In the state of Washington, different forms are employed in cities of varying populations. Rem.

Rev. Stat., § 9090 [P. C. § 897], provides for a commission form of government in cities having a population of less than thirty thousand persons. This form of government was not known in our state prior to the enactment of chapter 116, Laws of 1911, but it would be unreasonable to construe the constitutional provision as not now applying to a municipality which has adopted that form of city government. It is true that, at the time of the adoption of the constitution, the people in this state did not participate in legislation by means of the initiative or referendum, but since the enactment of chapter 186, Laws of 1903, the people of any city having a population of over twenty thousand persons may so participate directly in their municipal government, and without question are an important portion of the legislative authority of such city.

Constitutions are designed to endure through the years, and constitutional provisions should be interpreted to meet and cover changing conditions of social and economic life. The constitution nowise limits the form city charters shall take, nor the particular method of city government which may be established thereby, so long as the charter conforms to general laws. It is difficult to imagine a more comprehensive phrase than "legislative authority," and we are of the opinion that the framers of the constitution intended to use a term so broad as to cover all classes of legislative bodies functioning in cities, whether then in operation or to be put in operation in the future.

"Although the meaning or principles of a constitution remain fixed and unchanged from the time of its adoption, a constitution must be construed as if intended to stand for a great length of time, and it is progressive and not static. Accordingly, it should not receive too narrow or literal an interpretation, but rather the meaning given it should be applied in such a manner as to meet new or changed conditions as they arise." 16 C. J. S., Constitutional Law, pp. 49-50, § 14.

Many courts have adopted this principle of constitutional construction. We quote from certain applicable authorities.

"It was well said by the Supreme Court that the meaning of constitutional guaranties never varies, but the scope of their application must expand or contract to meet the new and different conditions which are constantly arising." *Fowler v. Obier*, 224 Ky. 742, 7 S. W. (2d) 219.

"The constitution is understood to be enduring and comprehending. Accordingly, language competent to the then existing state of society and at the same time capable of being expanded to embrace more extensive relations will be so interpreted and held adaptable to the relations and conditions of the present state of society. Thus, it may be said that the constitution is organic not only in the sense of being the fundamental law, but as a living thing designed to meet the needs of a progressive society. Beyond defining the form of government and conserving the rights of the individual citizen, a constitution is primarily a declaration of principles. When its language is so confined it is generally responsive to changing conditions, developing needs, and advancing science." *Jefferson County ex rel. Grauman v. Jefferson County Fiscal Court*, 273 Ky. 674, 117 S. W. (2d) 918.

"Constitutional principles do not change, except as they may be altered by the people through constitutional conventions or by amendments made in the manner prescribed by the constitution. The constitution does not mean one thing yesterday or today and another tomorrow. But while constitutional principles do not change, sometimes conditions do change and new and different conditions arise, and new statutes are enacted to deal with them, and constitutional principles must be applied to such new statutes and conditions as they arise, fairly, intelligently and impartially. The principles of the constitution must be preserved at all hazards, in all their pristine vigor and purity, and the language in which they are expressed given its plain and obvious meaning and true intent, uninfluenced by any spirit of expediency or opportunism. . . . But in applying such principles to new or changed conditions, the courts should fearlessly face the facts—the actualities and realities of the situations and questions thus presented, and apply the principles of the constitution to them without any sacrifice whatever of such principles, and without any strained construction of the language in which those principles are expressed." *Carlton v. Mathews*, 103 Fla. 301, 137 So. 815.

"The Constitution of the Commonwealth was designed to be an enduring instrument so comprehensive and fundamental in its terms that a free, intelligent and virtuous people may govern themselves under its beneficent provisions through vast changes in social and industrial conditions. In construing its regulations regard must be had to their spirit and purpose as well as to their letter. The great and underlying principles announced by the Constitution and its Amendments must be kept in mind as well as possible narrow interpretations of particular phrases." *In re Opinion of the Justices,* 291 Mass. 572, 196 N. E. 260.

The supreme judicial court of Massachusetts, *In re Opinion of the Justices,* 261 Mass. 523, 159 N. E. 55, answering a question propounded by the legislature concerning the constitutionality of a proposed measure extending the lease of the Boston Elevated Railway, and specifically asking whether or not the commonwealth might guarantee the payment of principal and interest of any securities that company might issue, held that the commonwealth had such power.

Article 62, § 1, of the amendments to the constitution of Massachusetts, provides:

"The credit of the commonwealth shall not in any manner be given or loaned to or in aid . . . of any corporation which is privately owned and managed."

After declaring that the corporation in question was operated and managed by a public board appointed by the governor, the court said:

"There is nothing in said art. 62 of the Amendments which restricts the lending of the credit of the commonwealth to such corporations as were under public management at the time of its adoption. A provision of the Constitution commonly is to be interpreted as stating a broad and general principle of government, regulative of all conditions arising in the future and falling within its terms."

To hold that the constitutional provision of the state of Washington above quoted, by the term legislative authority, related only to some one form of municipal legislature, and does not apply to other systems, would unduly restrict the constitutional language. We do not know what forms of

municipal government were in effect in this state at the time of the adoption of our constitution, but it is possible that under the territorial government several different forms had been adopted by the municipalities within the state. Our constitution, of course, antedates state legislation, and we are convinced that, by the use of the term legislative authority, it was intended by the constitution to cover future as well as contemporary forms of municipal government.

On the question of the construction of constitutional provisions, the following text from Horack's Sutherland Statutory Construction (3d ed. 1943), vol. 3, p. 84, § 5807, is pertinent:

"As a general proposition, there is greater likelihood that constitutional provisions will be given mandatory effect than is true of any other class of organic law. Indeed, such a construction accords with the generally acknowledged import of constitutional fiat; that its character is such as to require absolute compliance in all cases without exception. And the very principles of our institutions, involving as they do concepts of constitutional supremacy, are such as to form reasonable grounds for a presumption that the framers of a constitution intended that just such efficacy be given to it. However, a constitutional provision making it the duty of the general assembly to 'cherish literature and science' was held directory because of its vagueness, the court saying that in a clear case it could prevent the legislature from transgressing its duty, but that it could not compel compliance."

We shall now consider some of our own decisions. In the case of *Wade v. Tacoma,* 4 Wash. 85, 29 Pac. 983, the question to be determined was whether or not under § 10, Art. XI, of the constitution, *supra,* an amendment to the city charter to be placed before the voters for adoption or rejection had to be published for at least thirty days in two daily newspapers. It was held that the proposed amendment must be published in two daily newspapers published in the city for at least thirty days prior to the date of the election. Concerning this question, the court said:

"The respondent contends that the provisions of the constitution requiring the proposed charter to be published in two daily newspapers published in said city does not apply to amendments to charters, and that the words 'after notice of said submission published as above specified' do not relate to the proposed amendments, but to the notice of election. We think this would be the forced and not the natural construction of the language used in the constitution. The language of the constitution is not 'after notice of the election published as above specified,' but 'after notice of said submission published as above specified.' Submission of what? Evidently the submission of the proposed amendment; it is the amendment which is submitted and not the election, and it is the notice of the thing submitted which the latter part of the section is providing for. It may well be presumed that the constitution makers intended to guarantee to the citizens of cities as full and complete a notice of the amendments to charters as of the original charters. In fact there is no reason why they should not. There is no difference in the effect or operation of charter laws because one happens to be in the original charter adopted and the other an amendment to such original charter. The amendment may effectually supplant or destroy the original charter and institute a new policy altogether."

In the case of *Hindman v. Boyd*, 42 Wash. 17, 84 Pac. 609, there was presented the question of the constitutionality of a proposed amendment to the city charter governing the manner of granting certain franchises. It was contended that the proposed charter amendment would delegate to the people legislative power which was then by statute vested in the mayor and city council, § 10, Art. XI, of the constitution, *supra*, providing that

"Any city containing a population of twenty thousand inhabitants or more shall be permitted to frame a charter for its own government consistent with and subject to the constitution and laws of this state, . . . "

As the statute then in force, Bal. Code, § 740, provided that the legislative power of the city should be vested in a mayor and city council, it was contended that any delegation of legislative power to the people was in violation of the general laws, and consequently invalid. Concerning this question, the court said:

"It is contended that the granting of a franchise is the exercise of a legislative function, and that the proposed amendment divests the mayor and the council of the power to exercise it. This contention is based upon the statute as found in Bal. Code, § 740, which provides that the legislative powers shall be vested in a mayor and city council. Speaking, however, with reference to the powers of the mayor and council, the same section says, 'to have such powers as may be provided for in its charter.' It is clear, therefore, that the powers of the mayor and council are such as are granted by the charter. If the people choose to provide in their charter that the power to grant franchises of a given character shall not be given wholly to the mayor and council, but shall be reserved to themselves, can it be said that the granting thereof is such a legislative act as cannot be exercised by the people themselves? The power to make a charter is in a sense a legislative one. It is well known that charters so made often contain much that is legislative in its nature, such as the adoption of a complete scheme for making special assessments and other similar elaborate and detailed provisions. It is practically conceded by appellants that, if the statute, § 740, *supra,* were not in existence, it would lie with the people to discharge legislative functions."

It was held that the proposed charter amendment was not obnoxious to the objection urged against it. When the constitution was adopted, Bal. Code, § 740, was not in existence, and so far as the state of Washington is concerned, the repository of legislative authority was undefined, and the scope of this phrase cannot be limited by subsequent statutory enactment.

In the later case of *Hartig v. Seattle,* 53 Wash. 432, 102 Pac. 408, is found the following:

"The constitution provides that any city, containing a population of 20,000 inhabitants or more, shall be permitted to frame a charter for its own government, consistent with and subject to the constitution and laws of this state. So that, under the power of the constitution, subject to the limitation above mentioned, there can be no question of the right of the city to adopt and carry into effect the initiative and referendum plan of government; for it can scarcely be contended that this plan is inconsistent with a republican form of government, the central idea of which is a government by the people. Whether the expression

of the will of the people be made directly by their own acts or through representatives chosen by them is not material. The important consideration is a full expression."

■ The principle that under the constitution of this state the people are the source of all legislative authority has always been recognized.

Several of our decisions, commencing with the case of *Benton v. Seattle Electric Co.*, 50 Wash. 156, 96 Pac. 1033, which are reviewed at length in *Neils v. Seattle*, 185 Wash. 269, 53 P. (2d) 848, refer to the phrase legislative authority, as used in the constitution and statutes of this state, as meaning the mayor and city council. In none of these cases was the meaning or scope of these words, as contained in § 10, Art. XI, of the constitution, *supra*, before the court for construction. The cases turned on the question of whether or not certain proposed measures violated general laws. The matter of the meaning of the phrase referred to, as contained in certain statutes, was before the court, but statutes cannot control the constitution. As the *Hindman* and *Hartig* cases, *supra*, show, the act of the people of a municipality in adopting a city charter and in amending the same are legislative acts, and, in the absence of a statute expressly fixing the source of municipal legislative authority in certain instances, that authority under the constitution remains in the people. Obviously when the people perform a legislative act, they are exercising legislative authority.

In the case of *In re Pfahler*, 150 Cal. 71, 88 Pac. 270, 11 Ann. Cas. 911, 11 L. R. A. (N.S.) 1092, the supreme court of California used the following language:

"Much stress is placed by petitioner upon the fact that in section 8 of article XI of the constitution the words 'legislative authority' are used in designating the ordinary legislative body of the city. The use of these words is taken as indicating the intent of the constitution that no legislative power could be exercised, except by some representative body, such as a council, etc., which should have supreme authority as to all matters of legislative nature. We see no force in this contention. It was doubtless recognized by the framers of the constitution, as it must be by

every one, that in the conduct of municipal affairs it would be impracticable to do without the presence of a local legislative body of some kind, which should possess such powers in that behalf as might be granted to it, and that such a body would exist in every municipality. The words 'legislative authority,' as here used, have no greater significance than such words as 'common council or other legislative body' would have had. They were simply intended to designate the particular body, which it was recognized would exist under some name or other in every municipality, as the proper official agency to submit propositions for amendments to charters, and were not intended to define the powers of that body, or place it in a position where it would be beyond restrictions by the organic act of the city."

There can be no question but that to adopt a charter and amendments thereto, to initiate legislation, or pass upon the same by referendum, are legislative functions and the exercise of legislative authority. In the absence of restrictive words in the constitution itself, a court is not at liberty to restrict the language of the constitution, or to hold that procedure provided for the exercise of legislative authority applies to one legislative body and not to every such group.

The case of *State ex rel. Evans v. Superior Court,* 168 Wash. 176, 11 P. (2d) 229, is cited. This was an action in mandamus brought to require the election board of King county to submit, at a general municipal election, a charter amendment presented by an initiative petition. The superior court granted the writ, and that judgment was brought before us by certiorari for review. The constitutional provision above referred to was not considered by the court, the only question presented being whether, under the Laws of 1923, chapter 53, § 6 (Rem. Rev. Stat., § 5148-2), providing that not less than forty-five days before the date of any election to be held under the provisions of the act, there should be certified to the election board, etc., any proposition to be submitted to the voters. This court held that the proposition had been submitted to the election

board seasonably, pursuant to the statute above referred to, and the judgment of the lower court was affirmed.

In the case at bar, the proposed initiative was not filed in its completed form with the council forty-five days prior to the date of the election, and the council for that reason refused to act upon the petition. As we hold that the constitutional provision is controlling, the case is not here in point.

In the case of *State ex rel. Wiesenthal v. Denny,* 4 Wash. 135, 29 Pac. 991, 16 L. R. A. 214, the court considered questions presented concerning the submission to the voters of Seattle of a proposed amendment to their city charter. The court discussed the section of the constitution above quoted, saying:

"Just how far this grant was independent of legislation we are not called upon to say; but it may be safely said that wherever in this grant it is declared that a thing may be done in a certain way, when it comes to be done the doing it in that way will be sufficient.

" 'Wherever the language contains a grant of power it was intended as a mandate. Wherever the language gives a direction as to the manner of exercising a power, it was intended that the power should be exercised in the manner directed, and in no other manner.' *Varney v. Justice,* 86 Ky. 596 (6 S. W. Rep. 457).

" 'When the constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition or to extend the penalty to other cases.' Cooley, Const. Lim. (5th ed.), p. 78.

"The power to amend is in this instance as important as the power to enact."

In the case of *State ex rel. Hindley v. Superior Court,* 70 Wash. 352, 126 Pac. 920, in a departmental *per curiam* opinion, this court considered questions arising under the Spokane charter which are somewhat analogous to those here presented. The court considered several of our prior decisions, including some of those hereinabove cited, quoting from the case of *Wade v. Tacoma, supra,* a portion of the quotation from that case hereinabove set forth. It would

seem, however, that the court disregarded the first portion of the above quotation. *Inter alia,* the court held that voters of Spokane might submit amendments to the city charter at general or special elections, holding that the constitutional provision did not require that such amendments be submitted only at general elections. The question of the notice required by the constitution was not discussed by the court.

In view of the narrow scope of the decision in the case cited, and the fact that the result reached by the court is based on express permission contained in the section of the constitution above quoted, the opinion does not militate against our holding that, as to the notice which must be given before a charter amendment may be submitted to the voters, the constitutional provision is mandatory. The court discussed the case of *State ex rel. Wiesenthal v. Denny, supra,* and the case of *Reeves v. Anderson,* 13 Wash. 17, 42 Pac. 625.

In this connection, the following texts from 16 C. J. S., Constitutional Law, are pertinent:

"As stated in Corpus Juris, it is an established general rule that constitutional provisions are to be construed as mandatory unless, by express provision or by necessary implication, a different intention is manifest. Usually, therefore, constitutional provisions are mandatory rather than directory, and there are expressions to the effect that all constitutional provisions are mandatory. The intention of those who framed and adopted the constitution has, however, been considered, and, while there is a strong presumption in favor of its being mandatory, according to some cases, certain detailed provisions are to be treated as directory only, and if it appears from the express terms of a provision, or by necessary implication from the language used, that it was intended to be directory only, it will be so construed. . . .

"The word 'shall' or 'ought,' as used in a constitutional provision, is usually imperative or mandatory, and the word 'may' does not necessarily have a permissive import, but sometimes means 'shall' or 'must.' " 16 C. J. S., pp. 120-121, § 61.

"As a general rule, all provisions that designate in express terms the time or manner of doing particular acts and that

are silent as to performance in any other manner are mandatory and must be followed. Such provisions are in general exclusive in respect of the manner of performance and impliedly forbid performance in a substantially different manner, . . ." 16 C. J. S., p. 122, § 63.

Our cases are not harmonious, but we now hold that the constitutional provision requiring the giving of notice is mandatory, and that the phrase "legislative authority," as used therein, includes the voters acting by way of an initiative or referendum.

Our conclusion upon this matter renders unnecessary discussion of certain other questions which have been extensively argued. Those questions may be decided when directly presented.

The petition upon which this proceeding is based was directed to the mayor and city council of Seattle, and requested that the proposed charter amendment be submitted to the qualified voters and electors of the city of Seattle, for adoption or rejection. The petition does not request that the amendment be submitted at any particular election. It has been filed with the city clerk, and it would seem that, while it may not now be placed upon the ballot at the general election to be held March 14th next, it is still valid, and may, if containing sufficient valid signatures, be submitted at some subsequent election.

It should be noted that by Art. XX of the charter of the city of Seattle, a method is provided whereby the voters of that city may invoke the initiative and referendum. Under the circumstances of this case, the charter provisions are, however, unimportant.

As the notice of election required by the constitution has not been given, and as it is now too late to give that notice, the judgment before us for review is affirmed.

SIMPSON, C. J., MILLARD, JEFFERS, and MALLERY, JJ., concur.

STEINERT, J. (concurring)—While I am in accord with the views expressed by the majority, I am of the further opinion

that the affidavit *purporting* to attest the genuineness of the signatures to the petition does not comply with the mandatory provisions of § 2, chapter 186, Laws of 1903, quoted in the dissenting opinion. For this additional reason, I think the judgment of the trial court should be affirmed.

GRADY, J. (dissenting)—It seems to me that the method by which this case has been approached in the majority opinion and the result reached are not correct, and that the opinion injects into the case a complicated question of constitutional construction and interpretation not called for by the record before us for review.

The question to be determined is whether it is necessary that any kind of notice be given to the voters of a municipality that an amendment to a city charter will be submitted to them at the next regular municipal election when such amendment is proposed for submission by a petition of qualified voters of not less in number than fifteen per cent of the total number of votes cast at the last preceding municipal election.

We have in this state two concurrent methods by which a city charter may be amended. Section 10, of Art. XI, of the constitution, quoted in the majority opinion, provides that the "legislative authority" of a city may submit proposed amendments to the electors at any general election. Notice of such submission must be given by publication in two daily newspapers published in the city for at least thirty days prior to the day of submission. Notice of the election itself at which the amendments are to be submitted to the voters must be given for at least ten days before the day of such election. Chapter 186 of the Laws of 1903, p. 393, provides the other method and reads as follows:

"AN ACT to provide for the direct amendment of the city charters in respect to local affairs.

"*Be it enacted by the Legislature of the State of Washington:*

"SECTION 1. On petition of a number (equal to fifteen per cent. of the total number of votes cast at the last preceding municipal election) of qualified voters of any municipality

having adopted a charter under the laws of this State, asking the adoption of a specified charter amendment, providing for any matter within the realm of local affairs, or municipal business, the said amendment shall be submitted to the voters at the next regular municipal election, occurring thirty days or more after said petition is filed, and if approved by a majority of the local electors of the municipality voting upon it, such amendment shall become a part of the charter organic law governing such municipality.

"Sec. 2. The petition containing the demand for the submission of the proposed charter amendment shall be filed with the city clerk, and each signer shall write his occupation and residence after his signature, and the genuineness of the signatures on such paper must be attested by the affidavit of a qualified voter.

"Sec. 3. . . . ."

(I shall hereinafter refer to the constitutional provision as § 10 and chapter 186 of the Laws of 1903 as the act of 1903.)

It will thus be seen that, by § 10, the legislative authority of a city is given the right to submit amendments to the charter to the voters, and that, by the act of 1903, authority is given to qualified voters of a city, of a number equal to fifteen per cent of the total number of votes cast at the past preceding municipal election, to file a petition that specified amendments be submitted to the voters at the next regular municipal election occurring thirty days or more after the petition is filed. If an amendment is submitted by the legislative authority, notice of submission must be given; but if it is proposed for submission by a petition of voters, no notice of submission is required.

The language used in both § 10 and the act of 1903 is plain and unambiguous and, therefore, not open to construction or interpretation. I can see no occasion for any discussion or decision of the question whether the words "legislative authority" used in § 10 mean the ordinance enacting body of a city in existence when the constitution was adopted, or include also any other kind of legislative entity which might be thereafter created, such as the electorate under initiative and referendum charter provisions.

Section 10 is a grant of power and is in part procedural. If we assume that the words "legislative authority" of a city may mean the electorate thereof, it is quite clear that, in the very nature of things and by the operative mechanics of § 10, the electorate would not be the body that would submit to the voters a proposed amendment to a charter. This would be done by the mayor and city council. There never has been, and there is not now, any known method whereby the electorate, as a "legislative authority," can propose or submit to the electors a charter amendment. The only "legislative authority" now existing which may submit a charter amendment to the voters of Seattle is its mayor and city council. This was recognized by the legislature in § 3 of the act of 1903:

"Sec. 3. This act shall not be construed to deprive *city councils* from submitting proposed charter amendments to the voters as is now provided, but shall be held to afford a concurrent and additional method for proposing and submitting amendments to the charter of any municipality having a charter." (Italics mine.)

And when the act of 1903 was passed, the charter of Seattle had prior thereto been amended, reserving to the people, independent of the city council, the power to enact ordinances.

Although a different ultimate question for decision than we have here was before the court in *Benton v. Seattle Electric Co.*, 50 Wash. 156, 96 Pac. 1033, nevertheless it was necessary for the court to, and it did, determine that the words "legislative authority," as used in § 10 and the statutes enacted by the legislature, meant the mayor and city council, and said, p. 161:

"These latter statutes vest in the 'legislative authority' of the city power to prescribe the terms and conditions upon which electric railroads and railways may be constructed, operated, and maintained. It is maintained that the expression 'legislative authority of the city' means the mayor and city council. This contention is doubtless correct. That expression as used in § 10, art. 11, of the state constitution and in numerous statutes of the legislature, undoubtedly means the mayor and council of the city."

This definition of the words "legislative authority" was approved in *Neils v. Seattle,* 185 Wash. 269, 53 P. (2d) 848. The authorities recognize that, in the sense of the power to legislate, there may be more than one "legislative authority," but when such authority is authorized to do some act, such as the act of submission of a charter amendment to the voters, these words mean and refer to some body or agency capable of following the required procedure and putting into effect the acts and things to be done in order to get the proposed amendment before the voters. The idea was well expressed in *In re Pfahler,* 150 Cal. 71, 89, 88 Pac. 270, 11 Ann. Cas. 911, 11 L. R. A. (N.S.) 1092 (cited and quoted from in the majority opinion), as follows:

"It was doubtless recognized by the framers of the constitution, as it must be by every one, that in the conduct of municipal affairs, it would be impracticable to do without the presence of a local legislative body of some kind, which should possess such powers in that behalf as might be granted to it, and that such a body would exist in every municipality. The words 'legislative authority' as here used have no greater significance than such words as 'common council or other legislative body' would have had. *They were simply intended to designate the particular body which it was recognized would exist under some name or other in every municipality as the proper official agency to submit propositions for amendments to charters,* and were not intended to define the powers of that body, or place it in a position where it would be beyond restrictions by the organic act of the city." (Italics mine.)

When a petition is filed pursuant to the act of 1903, it does not emanate from the legislative authority of the city, but from a group of qualified voters. They are by law vested with the same authority to request that charter amendments be submitted to the voters as is the mayor and city council. Section 10 and the act of 1903 are wholly independent of each other, both as to authority granted and the procedure to be followed. Under the former, notice of submission has to be given, but this is not required by the latter.

It may be said that, because, by the constitutional method of submission, at least thirty days' notice is required, this

inheres in any legislation enacted on the same subject. I do not think this follows, for the giving of notice is not something relating to a substantive right, but is a procedural step only; and, further, a statute that is plain and unambiguous in its meaning cannot have carried into it a procedural requirement that is embodied in another statute or even in the constitution. Merely because one method of submitting a charter amendment requires a notice and another does not, is no reason why that part of the one should be injected into the other. If the legislature had desired that notice of submission be given, it would have so provided when it enacted the act of 1903.

The thirty-day published notice referred to in § 10 cannot apply to the act of 1903 for the reason that a petition can be filed any time up to the beginning of the thirty-day period preceding the date of the election provided for in that act; and if it be filed very close thereto such published notice could not be given. The petition would have to be checked to determine its sufficiency before the commencement of the publication, thus a substantial part of the thirty-day publication period would have been consumed.

The constitution contains no directive to the legislature that, in enacting legislation of this kind, notice of any sort shall be provided, nor is there anything in it of a prohibitive character in this respect. Under our constitutional system of state government, the legislature has the power to enact any law not in conflict with our state or Federal constitution, and it acted entirely within its powers when it did not require in the act of 1903 that notice of submission be given.

The fact that we, with our legal training and experience, may feel that, when the voters are called upon to decide whether a proposed charter amendment should be adopted, the voters should be notified by some form of publication in newspapers that an amendment was to be submitted at the coming election in order that they might inform themselves of its purpose and content so as to vote intelligently, does not justify us in either condemning a law that does not so provide or in reading into it such a requirement.

The wisdom or policy of legislation relative to notice is for the legislative department to decide, and it is our duty to apply the law as we find it.

Although the act of 1903 does not require that notice of submission be given, yet I think it is fair to assume that the proper authority of any city, when a charter amendment is to be submitted to the voters, will act in the best interests of the people and cause adequate publicity to be given so that its purpose will be made known to them.

The judgment of the lower court should be reversed and the case remanded, with instruction to that court to cause the writ of mandate requested by the relator to issue.

BLAKE and ROBINSON, JJ., concur with GRADY, J.

---

April 10, 1944.   Petition for rehearing denied.

