[No. 32831. *En Banc.* November 10, 1955.]

THE STATE OF WASHINGTON, *on the Relation of Edgar M. Swan, Appellant,* v. R. DEWITT JONES, *Prosecuting Attorney for Clark County, Respondent.*[1]

*Everal Carson* and *E. M. Swan,* for appellant.

*R. DeWitt Jones* and *David C. Hutchison,* for respondent.

FINLEY, J.—In this action, the relator is a citizen, resident, freeholder, and taxpayer of the city of Vancouver, Washington. He applied to the Clark county superior court for an order directing the respondent, the county prosecuting attorney, to institute proceedings in the nature of *quo warranto* against seven individuals, purportedly acting as members of the city council of Vancouver, Washington. Relator's objective was to oust the individuals from office. However, in effect, the lawsuit questions the validity of the "home rule" charter adopted by a substantial majority of the citi-

[1] Reported in 289 P. (2d) 982.

zens of Vancouver at an election in February of 1952, and the legality of the subsisting city government. The trial court refused to issue the order, denied relator's application, and dismissed the action. This appeal followed.

The facts are relatively simple. According to the 1950 census, the population of Vancouver, Washington, was then in excess of forty thousand. Under the authority of Art. XI, § 10, of the state constitution, the citizens of Vancouver had the right and were entitled to adopt a "home rule" charter for the government of their city. Pursuant to this authority, they enacted a city ordinance, which provided for the election of fifteen freeholders to formulate and draft a "home rule" charter. The freeholders were duly elected, and a charter was drafted. Among other things, Art. XI, § 10, of the state constitution provides that a proposed "home rule" charter

" . . . shall be published in *two daily newspapers published in said city*, for at least thirty days prior to the day of submitting the same to the electors for their approval, . . . " (Italics ours.)

In 1951, two newspapers were being published in the city of Vancouver. *Customarily,* the Columbian and Sun was published five days a week. The proposed "home rule" charter was published in thirty daily editions or issues of the Columbian and Sun prior to the day of election.

*Customarily,* the Clark County News was published weekly. However, under a contract with the city, the Clark County News went into *daily publication.* Thereupon, the proposed "home rule" charter was published in thirty daily issues of the Clark County News. There was no distribution of the paper by mail. The city of Vancouver was divided into four areas or sections. One thousand copies of the Clark County News were distributed on successive days in one of the four areas or sections of the city. Every fifth day, the distribution pattern was again commenced and completed, until the proposed "home rule" charter had been published for thirty days in thirty such issues of the Clark County News, distributed in the above-described manner.

In addition to the foregoing, wide and general publicity was given to the proposed "home rule" charter election by way of radio programs, newspaper stories, and articles appearing in both of the local newspapers and in the Oregon Journal and the Oregonian. The latter two large, modern, metropolitan newspapers are published daily in Portland, Oregon, and have a substantial and general circulation in Vancouver, and in Clark county, Washington. Notices of the special election were posted in the various polling precincts of Vancouver. There were numerous speeches and discussions of the proposed "home rule" charter before local civic and community groups.

Appellant concedes that the Columbian and Sun, although published only five days a week, is a daily newspaper within the meaning of the terms as used in Art. XI, § 10, of the state constitution. He urges that the Clark County News was not a daily newspaper, *customarily* published *as such*. In effect, he argues that the word *customarily* and the words *as such* should be inserted or read into Art. XI, § 10, of the state constitution. This interpretation, suggested by appellant, would have the pertinent provision read as follows:

"Said proposed charter shall be published in two daily newspapers [*customarily*] published [*as such*] in said city, for at least thirty days prior to the day of submitting the same to the electors for their approval, . . ."

In short, appellant contends that the News, as published and circulated under the contract with the city of Vancouver, was not a *daily newspaper* within the meaning of these two words as used in the state constitution.

Relator's petition sets forth the facts outlined above regarding the publication and distribution of the Clark County News. Paragraph six of his petition states that the Clark County News is a weekly newspaper at all times mentioned therein. Paragraph eight of the petition incorporates therein, by reference, Vancouver ordinance No. C-435. We note that § V of the ordinance characterizes the Columbian and Sun and the Clark County News as "Two daily newspapers, published in the city of Vancouver." Respondent's

answer does not deny, but admits the truth of paragraphs one through ten, inclusive, of relator's petition.

After the petition, answer, and reply, the parties entered into a stipulation and an agreed statement of the facts involved in the litigation. Paragraph five of the stipulation and agreed statement of facts sets forth the facts, as outlined hereinbefore, regarding the publication and distribution of the Clark County News under the agreement with the city of Vancouver for publication of the charter in thirty issues of the newspaper preceding the election.

The pleadings, as well as the stipulation and the agreed statement of facts, are a part of the record, and are before us on this appeal. We are convinced that these raise and present to us the question of whether, under the facts stipulated, the proposed charter was published for thirty days preceding the election in *two daily newspapers*, within the meaning of these words as used in Art. XI, § 10, of the state constitution.

The discussion which follows will be limited to the above question, as we are convinced there is no merit in any other question raised by appellant, or in respondent's motion to dismiss this appeal.

The pertinent constitutional provisions of Art. XI, § 10, and the pertinent statutory provisions of Rem. Rev. Stat., § 8953 [*cf.* RCW 35.22.050-35.22.100], are practically identical. In discussing the question involved in this appeal, we shall only refer to the constitutional provisions involved.

In construing constitutional, statutory, contractual, or other language or provisions of written documents, the cardinal rule of interpretation requires that the courts first determine whether the meaning of the particular language or provision is (a) unambiguous and clear, or (b) ambiguous and unclear. Some legal scholars have intimated that the process of interpretation and construction is inherent, even in the application of this primary or cardinal rule of interpretation. See Vol. 2 Horack's Sutherland, Statutes and Statutory Construction 316 (3rd ed. 1943), § 4502. However that may be, the authorities are numerous in

support of the proposition that interpretation is improper if the particular constitutional language or provision is clear and unambiguous. In *United States v. Sprague*, 282 U. S. 716, 731, 75 L. Ed. 640, 51 S. Ct. 220, 71 A. L. R. 1381, the court said:

"The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; *where the intention is clear there is no room for construction and no excuse for interpolation or addition.*" (Italics ours.)

The cases applying the foregoing principle of interpretation to statutes are legion. No citation of authority is requisite.

In *State ex rel. Troy v. Yelle*, 27 Wn. (2d) 99, 110, 176 P. (2d) 459, 170 A. L. R. 1425, the question was whether the legislature could establish a commission on interstate co-operation, the members of which would be the elected state officials, who would be paid salaries as commissioners in addition to their constitutional salaries as state officials. This court referred to the very positive, clear, and unambiguous language of the state constitution, which, for example as to the superintendent of public instruction, provided in Art. III, § 22, that "He shall receive an annual salary of twenty-five hundred dollars, which may be increased by law, *but shall never exceed four thousand dollars per annum.*" (Italics ours.) The court, in recognizing the practical implications of inflation, said:

"We may agree that the people, in framing the constitution, did not contemplate inflation or high prices. But the only recourse which relators have is to go to the people themselves for relief, and not to the legislature or the courts."

In other words, the court found that the constitutional language was clear and unambiguous, and the legislation authorizing the commission on interstate co-operation and providing a special salary for state elected officials serving on the commission was invalidated. Recently, in *State ex rel. Lemon v. Langlie*, 45 Wn. (2d) 82, 273 P. (2d) 464, a majority of the court determined that the pertinent constitutional provisions were clear and unambiguous, and re-

fused to resort to interpretation and construction of such language. The two cases specifically cited above, and many others that could be mentioned and quoted at *great length,* are applicable only when constitutional or statutory provisions are clear and unambiguous. On the other hand, if statutory, constitutional, or other language is unclear and ambiguous, the cases are numerous wherein it is held that interpretation by the courts is quite proper. Indeed, it is not only proper, but a responsibility of the judiciary, and an essential one. In connection with the general problem of constitutional application and interpretation, it has been reported that Mr. Justice Holmes once tersely remarked, with as much truth then as now, that the members of the United States supreme court could well keep in mind that it was a constitution which they were interpreting.

In *Village of Euclid v. Ambler Realty Co.,* 272 U. S. 365, 71 L. Ed. 303, 47 S. Ct. 114, 54 A. L. R. 1016, the court was called upon to decide the constitutionality of a zoning ordinance. Mr. Justice Sutherland, in 1926, speaking of constitutional interpretation and construction, and for the majority (William Howard Taft, C. J., Oliver Wendell Holmes, Louis D. Brandeis, Edward T. Sanford, and Harlan Fiske Stone), said at p. 386:

"Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. *And in this there is no inconsistency, for while the meaning of constitutional guar-*

*antees never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise.*" (Italics ours.)

In *Meredith v. Kauffman,* 293 Ky. 395, 169 S. W. (2d) 37, the court, interpreting a provision of the Kentucky constitution, said:

"The fundamental purpose in construing a constitutional provision is to ascertain the intention of the framers and the people in adopting it. *People's Transit Co. v. Louisville R. Co.,* 220 Ky. 728, 295 S. W. 1055. Words are but imperfect vehicles designed to convey thought and in gathering the thought intended to be conveyed the purpose behind the words should be kept in mind. The Constitution is concerned with substance and not with form and its framers did not intend to forbid a commonsense application of its provisions."

In *In re Morris' Estate,* 56 Cal. App. (2d) 715, 725, 133 P. (2d) 452, the California court said:

"The most important duty devolving upon a court in the construction of a written instrument, whether the same be a constitution, statute or a contract, is to discover the true meaning of the instrument and to glean therefrom the purposes and objects of the same."

In *State ex rel. Linn v. Superior Court,* 20 Wn. (2d) 138, 146 P. (2d) 543, this court stated:

"Constitutions are designed to endure through the years, and constitutional provisions should be interpreted to meet and cover changing conditions of social and economic life."

In the *Linn* case, *supra,* we cited and quoted with approval from *In re Opinion of the Justices,* 291 Mass. 572, 196 N. E. 260, as follows:

" 'The Constitution of the Commonwealth was designed to be an enduring instrument so comprehensive and fundamental in its terms that a free, intelligent and virtuous people may govern themselves under its beneficent provisions through vast changes in social and industrial conditions. *In construing its regulations regard must be had to their spirit and purpose as well as to their letter.* The great and underlying principles announced by the Constitution

and its Amendments must be kept in mind as well as possible narrow interpretations of particular phrases.' " (Italics ours.)

In *State ex rel. Chamberlin v. Daniel,* 17 Wash. 111, 115, 49 Pac. 243, the court quoted with approval from Sutherland on Statutory Construction, § 239, as follows:

" 'The practical inquiry is usually what a particular provision, clause or word means. To answer it one must proceed as he would with any other composition—*construe it with reference to the leading idea or purpose* of the whole instrument. The whole and every part must be considered. The *general intent* should be kept in view in determining the scope and meaning of any part. This survey and comparison are necessary to ascertain the purpose of the act and to make all the parts harmonious. They are to be brought into accord, if practicable, and thus, if possible, give a sensible and intelligible effect to each in furtherance of the general design. A statute should be so construed as a whole, and its several parts, as most reasonably to accomplish the legislative purpose. If practicable, effect must be given to all the language employed, and inconsistent expressions are to be harmonized to reach the real intent of the legislature.' " (Italics ours.)

In the same *Chamberlin* case, we further said, at p. 116:

"Another rule of interpretation is, that an act must be so construed that every part of the act and every legislative expression will, if possible, be given effect. And still another, that in case a proviso to an act is absolutely inconsistent with the provisions of the principal act and one cannot stand with the other, the proviso must be sacrificed to the life of the principal act. These canons of interpretation are, however, at the most, aids to construction, and after all it becomes the duty of the court to determine, if possible, what the real intention of the lawmakers was.

"There is, however, a principle of construction which applies to statutes, viz.: *a principle of strict construction, that does not apply to the construction of constitutions.*

" 'A constitution,' says Mr. Endlich in his Interpretation of Statutes, § 526, 'is "intended for the benefit of the people and must receive a liberal construction." "The principle of strict construction would frustrate important provisions in every newly constructed frame of government." Such is the general rule, the key note, as it were, of all interpretation of constitutional provisions, and is in harmony with the principles already discussed.' " (Italics ours.)

With the fundamental or technical distinction between ambiguous and unambiguous language in mind, and considering the preceding principles regarding the application or interpretation of statutes and constitutional provisions, we come now to a consideration of the meaning of the two small but significant words, *daily newspapers,* as used in Art. XI, § 10, of the state constitution.

Words are the tools of constitutional and legislative draftsmen. It is a truism that often their meaning is clear or unclear, depending upon context, the manner and method in which the particular words are used. In *Towne v. Eisner,* 245 U. S. 418, 425, 62 L. Ed. 372, 38 S. Ct. 158 (1917), Mr. Justice Holmes said:

"A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

On the other hand, there are some words or terms of art, the meaning of which may be relatively fixed. As to words of art, there are many examples; for instance, the words, *eight cubic feet,* or, *eight lineal feet.* It seems quite apparent to us that, under the circumstances in the case at bar, the words, *daily newspaper,* are not to be regarded as terms of art.

The Federal decennial census reports of 1890 show the population of the state as 349,390, and the population of several, then leading cities, as follows:

| | |
|---|---:|
| State | 349,390 |
| Seattle | 42,837 |
| Tacoma | 36,006 |
| Spokane | 19,922 |
| Yakima * (North Yakima) | 1,535 |
| Vancouver | 3,545 |
| Everett (nonexistent as a municipality) | ..... |
| Bellingham ** (New Whatcom) | 4,827 |
| (Fairhaven) | 4,076 |
| Olympia | 4,698 |
| Walla Walla | 4,709 |

\* Yakima was known as North Yakima in 1890.

\*\* New Whatcom and Fairhaven were separate municipalities in 1890. They were consolidated and named *Bellingham* in 1903.

The nationally recognized publication, *The Union List of Newspapers* (1937), indicates that around the year 1889 the following newspapers were being published in the above-listed cities of the state of Washington:

SEATTLE:

| | | |
|---|---|---|
| Seattle Budget | 1888-1890 | (Weekly) |
| Seattle Index | 1888-1904 | (Weekly) |
| Seattle Post-Intelligencer | 1876 | (Daily) |
| Seattle Press | 1886-1891 | (Daily) |
| Seattle Sunday Star | 1883-1890 | (Weekly) |
| Seattle Telegraph | 1890-1894 | (Daily) |
| Seattle Times | 1886 | (Daily) |

SPOKANE:

| | | |
|---|---|---|
| Spokane Weekly Chronicle | 1881-1891 | (Weekly) |
| Spokane Daily Chronicle | 1886 | (Daily) |
| Spokane Globe | 1888-1891 | (Weekly) |
| New Star News | 1886-1890 | (Started as daily, then weekly.) |
| Northwest Rural Tribune | 1888-1898 | (Weekly) |
| Spokane Record | 1887 | (Weekly) |
| Spokesman Review | 1884 | (Daily) |

TACOMA:

| | | |
|---|---|---|
| Tacoma Evening Call | 1891-1892 | (Daily) |
| Every Sunday | 1889-1892 | (Weekly) |
| Tacoma Weekly Globe | 1887-1892 | (Weekly) |
| Morning Globe | 1888-1895 | (Daily) |
| Tacoma Herald | 1891 | (Weekly) |
| Tacoma Weekly Ledger | 1880-1904 | (Weekly) |
| Tacoma Daily Ledger | 1883 | (Daily) |
| Tacoma News | 1881-1909 | (Weekly) |
| Tacoma News Tribune | 1883 | (Daily) |

OLYMPIA:

| | | |
|---|---|---|
| Olympia Republican Partisan | 1885-1889 | (Weekly) |
| Olympia State Capital | 1886-1908 | (Weekly) |
| Olympia Tribune | 1890-1893 | (Daily) |
| Olympia Weekly Tribune | 1890-1893 | (Weekly) |
| Washington Standard | 1860-1921 | (Weekly) |

VANCOUVER:

| | | |
|---|---|---|
| Vancouver Independent-Chronicle | 1875-1913 | (Weekly) |
| Vancouver Columbian | 1889-1926 | (Weekly) |
| Vancouver Register | 1865-1890 | (Weekly) |

BELLINGHAM:

| | | |
|---|---|---|
| Bellingham Bay Express | 1890-1894 | (Twice weekly; then daily) |
| Bellingham Herald | 1890 | (Daily) |
| Reveille | 1883-1922 | (Weekly; then semi-weekly) |

| | | |
|---|---|---|
| Bellingham Reveille | 1890-1927 | (Daily) |
| World Herald | 1889-1911 | (Weekly) |
| EVERETT: | | |
| Everett Herald | 1890-1919 | (Weekly) |
| WALLA WALLA: | | |
| Morning Journal | 1881-1890 | (Daily) |
| Journal & Watchman | 1883-1890 | (Weekly) |
| Walla Walla Statesman | 1861-1910 | (Weekly) |
| Evening Statesman | 1880-1911 | (Daily) |
| Walla Walla Union | 1869-1908 | (Weekly) |
| YAKIMA: | | |
| Yakima Weekly Herald | 1889-1912 | (Weekly) |
| Yakima Weekly Republic | 1879-1919 | (Weekly) |

It is shown by the above list that there were four so-called daily newspapers in Seattle, two in Spokane, and four in Tacoma, together with a number of so-called weeklies published in each city. Olympia had four weeklies and one so-called daily from 1890 to 1893. Vancouver had no dailies, but three weeklies. Bellingham had three weeklies or semi-weeklies, and, beginning in 1890, the city had two dailies. Walla Walla had two dailies and three weeklies.

Only Seattle and Tacoma had the requisite population in 1890 to qualify for the adoption of a "home rule" charter under Art. XI, § 10, of the state constitution. Spokane was just barely short of the required population. As to population, several of the next largest cities were short of qualifying by a wide margin. In 1889, the dissemination of public and other information to the citizenry was accomplished largely through the medium of newspapers. In cities with populations of twenty to forty thousand, or, in some instances, in cities with considerably less population, there was certainly no dearth of newspapers, either those published daily or weekly.

Apparently, the right of citizens to make changes in the form of their city governments through the adoption of "home rule" charters was regarded as a serious and important matter by the framers of the state constitution, and properly so. Adequate notice to the citizenry of any proposed changes in city government, seemingly, was regarded

as equally important, and properly so. Under the circumstances, daily publication in two newspapers for thirty days of proposed changes in city government was easily possible, and, at the time, was the most efficient and desirable means of providing adequate notice to the voters.

Unquestionably, these considerations governed the intention of the framers of the constitution in connection with the promulgation of Art. XI, § 10. Obviously, there were no radio or television stations, and no other media or agencies for the dissemination of news and information to the public. The competitive effect of radio and television, and the effect of national advertising agencies and of national news-gathering agencies, such as the Associated Press, did not exist. Modern transportation facilities, which permit contemporary metropolitan newspapers to distribute their editions promptly and effectively over a large geographical area in competition with local news and advertising media, was, of course, also nonexistent in 1889. Consequently, the competitive restrictions on the number of newspapers resulting from these modern innovations were unknown and not anticipated in 1889, when the state constitution was formulated and adopted.

An examination of the files of the Seattle Post-Intelligencer for the months of January through March, 1889, indicates that it was a paper of four and eight pages on alternate days, with a Sunday edition of eight pages. There was no organization of the paper into special or different sections. About one half of the paper consisted of classified advertising; the other half contained local and national news. An examination of the files of the Vancouver Independent Chronicle, a weekly newspaper, for a period of six months (January through June, 1889), indicates that it was consistently a newspaper of only four pages—one large sheet, folded in the middle, with pages numbered one to four, inclusive. The pages of the 1889 Chronicle were divided about equally between advertising and local gossip, with merely a sprinkling of national news. The paper also carried a serialized novel within the confines of its four pages.

These statistics give some indication of what newspapers were like around the year 1889. Such publications were a far cry from, and were, undoubtedly, quite different from today's metropolitan newspapers, such as the Seattle Post-Intelligencer and the Seattle Times. The latter modern newspapers, with six or seven regular daily editions, divided into special sections and nationally syndicated columns, and their large special Sunday editions with comic strips of several pages, might very well not be regarded as daily newspapers as such were known to the readers or publishers of those which existed in the year 1889.

In *Fairhaven Publishing Co. v. Bellingham*, 51 Wash. 108, 98 Pac. 97, two newspapers submitted bids for all of the official advertising of the city of Bellingham. The Bellingham Herald was printed six days a week, but not on Sunday. The Morning Reveille was printed five days a week, but not on Sunday or Monday. The latter newspaper was the low bidder, and was awarded the contract. The Bellingham Herald objected, and instituted a lawsuit on the ground that its competitor, the Morning Reveille, was not a daily newspaper as these words were used in the city charter. On appeal, this court said that the term *daily*, as applied to the publication of newspapers, is relative, and held that the Morning Reveille, printed five days a week, was a daily newspaper. See *Bellingham v. Bellingham Publishing Co.*, 116 Wash. 65, 198 Pac. 369; *Hansen v. Havre*, 112 Mont. 207, 114 P. (2d) 1053, 135 A. L. R. 1278; *State ex rel. Winn v. San Antonio* (Tex. Civ. App.), 259 S.W. (2d) 248 (1953).

In *People ex rel. Utica Sunday Tribune Co. v. Hugo*, 93 Misc. 618, 625, 158 N. Y. S. 490 (affirmed 174 App. Div. 901, 159 N. Y. S. 1136), the court said:

"It is also urged that because the county treasurer is required to publish notices of delinquent sales for unpaid taxes twice each week in the same newspapers which are designated to publish the Session Laws and concurrent resolutions (Laws of 1902, c. 559), and, because the Boonville *Herald* is a weekly newspaper, that paper was for that reason improperly designated. The defendant's answering affidavits show that it is his intention to publish a semi-weekly edition of the Boonville *Herald during the period*

*when such notices are required to be published* and to send the same to all its subscribers. This, it seems to me, will fully satisfy the requirements of the statute with respect to a publication of notices of tax sales twice in each week." (Italics ours.)

Similarly, the Missouri court of appeals said, in *State ex rel. Law & Credit Co. v. Thomas,* 203 Mo. App. 452, 457, 220 S. W. 702:

"The question as to whether the contract was properly let to a newspaper that was not a daily newspaper either at the time of the submission of the bids or at the time of the letting of the contract, is one that requires serious consideration. While the statute provides that the board shall publish a notice designating when and where said board will 'receive sealed proposals from daily newspapers published in said city for the publication of all advertisements,' etc. and 'shall award the printing of all said publications to the newspaper naming the lowest and best bid,' its terms are not definite and explicit as to whether the newspapers shall be a daily at the time it submits its bids or at the time of the publication of the advertisements, etc. In this situation it is proper to ascertain the intention of the Legislature which framed the statute. . . .

"Whether that newspaper should be a daily newspaper at the time the bids are submitted and when the contract is let was not material. The material consideration was whether the newspaper is a daily newspaper at the time the notices are to be inserted. It, manifestly, would not be material whether the paper was a newspaper before the work was actually to be done by it for the reason that it might be a daily newspaper at the time the bids were submitted or the contract let and might not be one during the time the insertions were to be made in it. *We do not think that the Legislature was concerned with the question as to whether the newspaper should be a daily newspaper at any time other than when the work of publishing the notices was to be performed.*" (Italics ours.)

In 2 Merrill on Notice 16, § 656 (1952), the author states:

"Command for publication in a newspaper of a certain frequency must be followed. The effectiveness of compliance is not destroyed by the fact that the new schedule of appearance was commenced after the award of the printing, solely to qualify therefor, *or that it was temporary in character.*" (Italics ours.)

Respondent urges affirmance of the trial court on the basis of the doctrine of substantial compliance. He relies, in part, upon *Seymour v. Tacoma*, 6 Wash. 427, 431, 33 Pac. 1059, wherein the court said:

"Certain rules as to notice of elections have become well settled, and none of them are better settled than that the formalities of giving notice, although prescribed by statute, are directory merely, unless there is a declaration that unless the formalities are observed the election shall be void.

" 'It is a canon of election law that an election is not to be set aside for a mere informality or irregularity which cannot be said in any manner to have affected the result of the election.' Dillon, Mun. Corp., § 197, n. 3, and cases cited."

In support of the theory of substantial compliance, respondent further relies upon *State ex rel. Billington v. Sinclair*, 28 Wn. (2d) 575, 583, 183 P. (2d) 813, in which the court said:

"It will be noticed that the constitutional provision is that ' . . . *Any city containing a population of twenty thousand inhabitants or more shall be permitted to frame a charter* . . .' (Italics ours.) The framers of the constitution could not have used more emphatic language in granting a right to the inhabitants of a city containing a population of twenty thousand or more. There is no qualification or reservation of this right. . . .

"Although this particular question has never been directly passed upon, we have at least indirectly held that the right of a city, with a population of more than twenty thousand people, to adopt a charter and become a city of the first class is inviolate."

A report of the Washington state census board, published August 1, 1954, shows as follows the approximate dates when the population of Washington cities reached a figure of twenty thousand:

| | |
|---|---|
| Seattle | Prior to 1900 |
| Tacoma | ditto |
| Spokane | ditto |
| Bellingham | About 1907 |
| Everett | About 1908 |
| Yakima | About 1925 |
| Vancouver | About 1941 |
| Bremerton | About 1944 |
| Walla Walla | About 1945 |
| Aberdeen | (No data) |

The following table shows the dates when Washington cities have adopted "home rule" charters pursuant to the right given their citizens to do so under Art. XI, § 10, of the state constitution:

| City: | Dates of adoption of city charter: |
|---|---|
| Seattle | October 1, 1890 (1st) |
| | March 3, 1896 (2d) |
| | March 12, 1946 (3d) |
| Spokane | December 28, 1910 |
| Tacoma | June 1, 1927 (1st) |
| | June 1, 1953 (2d) |
| Everett | April 16, 1912 |
| Bellingham | July 29, 1904 |
| Yakima | June 8, 1931 |
| Aberdeen | December 12, 1929 |
| Vancouver | February 11, 1952 |
| Bremerton | October 19, 1942 |

Walla Walla has not to date adopted a "home rule" charter. However, with this one exception, the citizens of other Washington cities have adopted such charters fairly promptly when such cities have been able to qualify as to the requisite population of twenty thousand. This appears to support the view expressed by the court in *State ex rel. Billington v. Sinclair, supra,* that the right to adopt "home rule" charters is an important and fundamental one under our constitution. Furthermore, it seems to be so regarded by a majority of the voting citizens of Washington cities.

It may be of some interest to note that our research indicates that Tacoma, Bellingham, Everett, Aberdeen, Bremerton, Vancouver, and Walla Walla, at the present time, have only one daily newspaper, *customarily published as such.* Furthermore, our research seems to indicate that Aberdeen, Bremerton, and Vancouver had only one daily newspaper, customarily published as such, at the time such cities adopted their "home rule" charters.

In urging the doctrine of substantial compliance, respondent, in essence, argues that significant substantive provisions of the constitution should not, in effect, be canceled out by other provisions of the constitution, merely procedural in nature, which concern publication of notices of

elections—in other words, that procedural provisions should be interpreted in a manner to give full effect to more fundamentally important substantive provisions whenever reasonably possible.

In the *Seymour* case, *supra,* and in subsequent cases, this court has unquestionably approved and applied the doctrine of substantial compliance in the application and interpretation *of statutes.* Respondent's argument relative to the doctrine of substantial compliance is persuasive. This latter is true, particularly in view of the historical record showing the importance the citizens of Washington cities have attached to the constitutional right to adopt "home rule" charters. However, at this time, we are reluctant to dispose of this appeal on the basis of the doctrine of substantial compliance. It is not necessary to do so, because, as we view the facts and circumstances involved in the instant case and the question submitted to this court for determination, we think that the Clark County News, under its contract with the city of Vancouver, was published as, and was, a daily newspaper for the period of thirty days during which the proposed "home rule" charter was published in the newspaper. Under the reasoning of the Missouri court of appeals in *State ex rel. v. Thomas, supra,* the proper test is whether the News was a daily newspaper at the time or during the period the proposed Vancouver "home rule" charter was published in it. We are convinced that, under the facts and circumstances involved, it was possible for the city of Vancouver to comply precisely with the provision of Art. XI, § 10, of the state constitution. The relator suggests only one possible interpretation of the pertinent constitutional language. This, as indicated above, requires, in effect, an insertion or reading into the constitution the words, *customarily published as such.* The interpretation suggested by the respondent is a more reasonable one. We think it does less violence to the language of the constitution, and is more in accord with the spirit and the intent of such language and with the intention of the framers of the constitution.

In *State ex rel. Chamberlin v. Daniel, supra,* at page 119, we stated that the courts must,

" . . . if possible, adopt that construction which will give force and effect to every part of the law, to every clause in a section and every word in a clause, rather than a construction which will destroy or render meaningless any portion of the law."

The constitution makers were wise, far-sighted men. However, they were not infallible. No group of men of comparable wisdom and integrity could foresee every possible future contingency with respect to which a particular constitutional provision might be applicable. The very nature of any constitution, whether of government or of some local fraternal club, is that it is a basic document. Its function and purpose is to set forth general basic truths and guides. It is not legislative in character. If that were true, the basic documents of government would run to thousands of words and pages wherein minute legislative details would be spelled out as accurately as possible, considering, of course, expressional ambiguities inherent in the words of the English language, or in any other language used by mankind as a media for the transmission of thoughts and ideas. Perhaps not so incidentally, it could be observed here that basic truths and ideas, or the intent of the constitutional fathers, should be controlling rather than the particular words or language symbols used to convey a thought or an idea from the mind or intellect of the draftsman to the mind of another person; for example, a subsequent reader of the document, or persons interested or affected by its provisions.

Unquestionably, the primary purpose of the constitution framers respecting Art. XI, § 10, was to permit the citizens of a city such as Vancouver to adopt a "home rule" charter for their own government. Notice and information to the voters of a city regarding a proposed charter and its provisions was *the only purpose of the procedural details written into the constitution regarding publication in two daily newspapers*. Of course, this latter factor is important, and the importance of notice to the voters should in no way be underemphasized or disregarded. There were few cities of twenty thousand people in this state over sixty years ago. It is quite reasonable that the draftsmen of the constitution

must have felt certain that two daily newspapers, customarily published as such, could always be found in any city of twenty thousand people. That such a city would have only one daily newspaper, or none at all, but that it might have an excellent radio or television station for the dissemination of news and information to the public, simply did not occur to the constitutional fathers. Obviously, as mentioned above, radio and other modern innovations relative to advertising and the dissemination of news were unknown. Their limiting, competitive effect on the number of newspapers a city of twenty thousand could support was not anticipated. Such a minor error in judgment by the constitutional draftsmen, if it be one, appears to be understandable.

A strict interpretation in the instant case stresses, honors, and heaps confusion upon the two words, *daily newspaper*, and upon the application and operation of Art. XI, § 10, of the state constitution. A broad, and it might be said reasonable, interpretation recognizes reality and emphasizes the *real purpose* of the constitution makers, which was *the giving of reasonable notice to voting citizens*. It is certainly not a disregard of the real purpose of the constitution to approve adequate means of notice aside from those narrowly specified by a strict interpretation of the words, *daily newspaper*. Except for a narrow, extreme definition of *daily newspaper*, the Clark County News, when published five days a week for thirty issues during a period of more than thirty days, should be regarded as a *daily newspaper; i.e.*, during the period when it was published five days per week and carried the proposed "home rule" charter in thirty issues. *State ex rel. Law & Credit Co. v. Thomas, supra*. At that time it certainly was not a weekly paper. It is the idea of whether it was *customarily* published daily that gives trouble in a narrow, strict approach to the problem.

The constitution does not use the word *customarily*. It does not require publication in a newspaper *customarily* published daily. *The constitution is not that precise and exacting.* It would seem to be not even a slight exaggeration

that the constitution makers, *and certainly lay minds and voting citizens*, would agree that publication of the charter for five days per week for over thirty issues during a period of more than thirty days in the Clark County News *would* constitute daily publication in a newspaper; and that such notice of the charter and its provisions would constitute (a) adequate notice and information to the interested voters of Vancouver, and (b) compliance with the provisions of Art. XI, § 10, of the constitution. In other words, it is a sound position that the publication of the charter by the city in the Columbian and in the News constituted compliance with the publication requirements of the constitution, and provided effective and adequate notice to the citizens concerning the proposed charter election, the new charter, and its provisions. We are reassured in this conclusion by the fact that widespread publicity was also given to the proposed charter by radio, by articles in the large dailies of the Portland, Oregon, metropolitan district, by speeches and discussion in local, civic and community clubs.

In almost any case involving the interpretation of constitutional provisions, the arguments are available, and either of the opposing parties litigant may contend, and sometimes do in intemperate language, that the particular construction asserted by the opposition distorts or perverts and wrecks the constitution; that it thwarts its noble purposes, is inimical to the best interests of the people, and is destructive of the basic design of our form of government. When there is some basic truth in such superlatives, a case then becomes one of great judicial concern, and the winnowing of the wheat from the chaff is a grave judicial responsibility. But in any event, histrionics are beside the point. They may have their place elsewhere; if so, it would be in another forum.

Undoubtedly, the outcome of the instant case is of considerable importance to the *particular* parties litigant. However, the legal principles and the judicial problem involved are hardly ones of history-making, world-shaking consequence. Indeed, the problem before us is a very simple

one; histrionics, or even the garden variety of superlatives, should not make it appear to be otherwise. It involves the interpretation of constitutional language which is certainly not crystal clear. Two possible, but distinctly different interpretations of Art. XI, § 10, of our state constitution are asserted by the opposing parties in the lawsuit. We are simply called upon to consider the two interpretations suggested by the parties, and to determine in our best collective judicial judgment which interpretation is the more reasonable and the more consistent with the intent of the founding fathers and the citizens of this state as to the meaning and purpose of Art. XI, § 10, when the constitution was drafted and adopted as our basic charter of government.

There should be nothing surprising or of a particularly shocking nature in this, because, under our form of government, and in our way of life in this country, it is accepted and well understood in lay circles—and it has long been recognized in respectable and competent legal circles—that the interpretation of constitutional provisions is not only a proper and a very necessary function, but also is a duty and a responsibility of the judicial branch of our government. In some countries this is not the case. There, the executive, or perhaps the legislative branch, performs the function and assumes the duty and the responsibility of constitutional interpretation. To reiterate: The procedure is different in our beloved country, and this has been true, certainly, since the time of Chief Justice John Marshall and his decision in *Marbury v. Madison,* 5 U. S. 137, 1 Cranch 137, 2 L. Ed. 60. Here, judicial interpretation of constitutional provisions has become a proper, an important, and we daresay a fortunate distinction under our American form of government.

For the reasons indicated hereinbefore, the judgment of the trial court should be and is in all respects hereby affirmed.

MALLERY, ROSELLINI, and OTT, JJ., concur.

WEAVER, J. (concurring in the result)—Article XI, § 10, of the Washington constitution, which reads as follows:

" . . . Said proposed charter shall be published in two daily newspapers published in said city, for at least thirty days prior to the day of submitting the same to the electors for their approval, as above provided . . ."

is, to my mind, clear and unambiguous. It would be difficult to state the obvious intention of the framers in more compendious or terse language.

"Where the intention is clear there is no room for construction and no excuse for interpolation or addition." *United States v. Sprague,* 282 U. S. 716, 75 L. Ed. 640, 51 S. Ct. 220, 71 A. L. R. 1381 (1931).

Hence, I am unable to appreciate the applicability, to the instant case, of the excellent discussions of constitutional interpretation contained in both the majority and dissenting opinions.

It is my firm belief that the sole question, meriting consideration on this appeal, is one of fact—namely, was the Clark County News a *daily newspaper* during the period it published the proposed city charter? If it were, then there has been compliance with the constitution.

Bearing in mind that the apparent and obvious purpose of the constitutional provision is to give notice to the electorate for a prescribed period, the nature of the paper prior to the first publication and subsequent to the last is immaterial. It is the nature of the paper during the period the charter is published which is controlling. See *State ex rel. Law & Credit Co. v. Thomas,* 203 Mo. App. 452, 457, 220 S. W. 702 (1920); *People ex rel. Utica Sunday Tribune Co. v. Hugo,* 93 Misc. 618, 625, 158 N. Y. S. 490, affirmed 174 App. Div. 901, 159 N. Y. S. 1136 (1916).

Agreed facts, established by stipulation and admissions of counsel, are the only ones before us. Turning to the stipulation and admissions, the following appears pertinent to this question:

" . . . that the Clark County News was at all times mentioned herein a Weekly newspaper, published in said City.

" . . .

"That subsequent to the framing of said proposed Charter the duly elected and qualified officials of said City entered

into a contract with the above named *newspapers* to publish said purposed [*sic*] Charter for 30 days, the said Clark County News agreeing to issue its *Newspaper* 5 days each week [the trial court's memorandum opinion states it was published *six* days each week] until it had published said proposed Charter in 30 issues;

" . . .

"That the Clark County News distributed the *daily edition* of its paper printed in accordance with its bid, copy of which is attached hereto and made a part hereof, by having it distributed from house to house by high school students; . . . " (Italics in the above quotation are mine.)

Nowhere in the record before us, nor in argument of counsel, is it suggested that the Clark County News was not a *newspaper*. It is so stipulated by counsel (as I have indicated), and found to be such by the trial judge in his memorandum. Since the cause was submitted on stipulation of agreed facts, the trial judge made no findings of fact.

Contrary to the stipulation (either by oversight or design), no copy of the News has been submitted for our inspection. However, in the absence of any proof to the contrary, we can only accept the agreement of counsel and the finding of the trial court that it was a *newspaper*. There is no evidence that it was a "handbill."

Did publication for five (or six) days a week comply with the constitutional provision? I believe it did. In *Fairhaven Publishing Co. v. Bellingham,* 51 Wash. 108, 109, 98 Pac. 97 (1908), this court said:

"The only question we are required to notice is whether The Morning Reveille is a daily paper [published five days each week], within the meaning of that term as it is used in the city charter. We think it is. The term daily, as applied to the publication of newspapers, is relative. It has never been given the exclusive meaning of every day of the week, month or year, but papers published every day except Sunday, or every day except Monday, or every day except both Sunday and Monday, are regarded by the general public as daily papers."

Thus, on the short record before us, I believe that the Clark County News, during the period in question, was a

daily newspaper. Publication of the charter therein complied with the constitutional provision.

I prefer to affirm the judgment of the trial court for the reasons I have stated.

OTT, J. (concurring specially)—I have signed the majority opinion, but feel compelled to emphasize an additional amendment that would have to be read into the constitution, if the appellant's contention were to be sustained. The majority opinion emphasizes only one, relating to the procedural matter of notice.

The questioned section of the constitution (Art. XI, § 10) provides in part:

". . . Any city containing a population of twenty thousand inhabitants, or more, shall be permitted to frame a charter for its own government, . . ."

There is no qualification or reservation in the *right* of a city to frame its own charter, except that it have the requisite population.

To sustain appellant's contention, a second amendment would be necessary relating to substance, namely, that only those cities can qualify for a charter which contain a population of twenty thousand or more inhabitants, *and* which have within their borders "*two daily newspapers regularly published as such.*"

I am satified that those who framed our constitution never intended, as is suggested by appellant, that there should be such an additional requirement placed upon a city in order to qualify for a charter form of government.

That the city met the single substantive constitutional requirement of population is not disputed. That it caused the notice to be published in two newspapers, both of which were published and distributed daily in Vancouver for the entire thirty-day period prior to the day of submitting the proposal to the electors for approval or rejection, was clearly established by the stipulated facts. The city fully complied with all of the constitutional requirements.

DONWORTH, J. (dissenting)—For the reasons hereinafter stated, I am of the opinion that the majority, in interpreting

Art. XI, § 10, of the constitution, has gone far beyond the bounds of judicial interpretation and has, in effect, amended it. This is a power which the people have reserved exclusively to themselves.

Furthermore, even if the majority opinion be considered as an interpretation of § 10, it is directly contrary to our decision in *Wade v. Tacoma,* 4 Wash. 85, 29 Pac. 983, which is discussed below.

Because of the importance of the question involved not only to the people of Vancouver but also, in a greater degree, to the people of the entire state of Washington (who have adopted their constitution and reserved to themselves exclusively the power to amend it), I deem it proper to state my views at some length.

In interpreting our constitution, we should have in mind two provisions thereof (Art. I, §§ 29 and 32) which were included in it for our guidance.

Section 32 lays down this basic principle of interpretation:

"A frequent recurrence to fundamental principles is essential to the security of individual rights, and the perpetuity of free government."

Concerning this constitutional provision, this court, in *Wheeler School Dist. v. Hawley,* 18 Wn. (2d) 37, 137 P. (2d) 1010, said:

"This is not in any sense an inhibition on legislative power. Clearly, it is but an admonition not only to the legislature *but also to the courts* to keep constantly in mind *the fundamentals of our republican form of government*— among others, the cleavage between the legislative and the judicial powers. It is thought, however, that the clause warrants the court in holding the act unconstitutional on the theory that it is violative of the principles of local self-government." (Italics mine.)

One of the fundamentals of our republican form of government is the separation of powers into three departments (executive, legislative, and judicial), with the residue of all power of government being reserved by the people (Art. I, § 1). In our constitution, the power to amend it, whether by proposal made by two thirds of each house

of the legislature, or by a constitutional convention called by such vote of the legislature, is vested solely in the people. See Art. XXIII.

Notwithstanding this fundamental principle, the majority has, under the guise of interpreting three words in Art. XI, § 10, held that the provision requiring that the "proposed charter shall be published in *two daily newspapers* published in said city" does not mean what it says, but that publication in *one* daily newspaper and in one allegedly weekly newspaper distributed every fourth day by high school students to homes in one fourth of the city is sufficient to satisfy the mandatory requirements of § 10.

This holding ignores another fundamental principle which is stated in our constitution in Art. I, § 29, as follows:

"The provisions of this Constitution are mandatory, *unless by express words they are declared to be otherwise.*" (Italics mine.)

Since there are no express words in Art. XI, § 10, declaring the provisions thereof to be nonmandatory, those provisions *are* mandatory. Nothing could be plainer than that.

Notwithstanding this plain mandate of the people, the majority divides the constitution into two divisions: those parts containing so-called "substantive" provisions, and those containing so-called "procedural" provisions. As to the former, the majority recognizes that they must be obeyed, but it holds that the latter are directory only and need not be followed as written. Thus is the will of the people thwarted and the continuance of constitutional government in this state jeopardized.

As applied to Art. XI, § 10, which is construed by the majority in this case, the following words are held to be mandatory:

"Any city containing a population of twenty thousand inhabitants, or more, shall be permitted to frame a charter for its own government, consistent with and subject to the Constitution and laws of this state, . . ."

(The majority cites *State ex rel. Billington v. Sinclair,* 28 Wn. (2d) 575, 183 P. (2d) 813, as recognizing that the

right of the city of Vancouver to adopt a charter is "inviolate" under the quoted language.)

But the later sentence in this same section, reading:

"Said proposed charter shall be published in two daily newspapers published in said city, for at least thirty days prior to the day of submitting the same to the electors for their approval, as above provided,"

is said to be merely "procedural" and, therefore, not mandatory.

The people have said in their constitution that *each* of the above quoted sentences is of equal force and validity, but the majority holds that the first provision is inviolate, while the second need only be substantially complied with. There is no justification whatever for the court's thus rewriting the constitution in defiance of the plain meaning of Art. I, § 29, *supra*.

With the provisions of Art. I, §§ 29 and 32, *supra*, in mind, let us consider the facts of this case concerning the publication of the proposed city charter in the Clark County News, the legal sufficiency of which is the sole legal question involved. The facts material to this controversy appear in an agreed statement of facts prepared by the parties.

Paragraph I of the agreed statement of facts admits the allegations of the first ten paragraphs of appellant's petition. Consequently, it is admitted in this case:

"5. That Section 10 of Article 11 of said State Constitution and Section 8953 of Remington's revised Statutes of Washington provided that such proposed Charter shall be published for 30 days in two daily newspapers published in said City before being submitted to a vote of the electors in said City for approval.

"6. That at all times mentioned herein only one Daily Newspaper was published in said City, to-wit: The Columbian and Sun; that the Clark County News was at all times mentioned herein a Weekly newspaper, published in said City.

"7. That subsequent to the framing of said proposed Charter the duly elected and qualified officials of said City entered into a contract with the above named newspapers to publish said *pur*posed Charter for 30 days, the said Clark County News agreeing to issue its Newspaper 5 days each

week until it had published said proposed Charter in 30 issues; that said Clark County News has never qualified as a Legal Daily Newspaper under the provisions of Chapter 213 of the Laws of 1941 of the State of Washington."

Paragraphs IV, V, and VI of the agreed statement of facts state:

"IV. That the Clark County News distributed the daily edition of its paper printed in accordance with its bid, copy of which is attached hereto and made a part hereof, by having it distributed from house to house by high school students; that one thousand (1,000) copies of the paper containing a copy of the proposed charter would be distributed in a certain section of the city on one day and then one thousand (1,000) copies distributed in another section on the next day and so forth, and on the 5th day they would start distribution again, thus covering the same section of the city every 4th day; that this method of distribution continued for thirty (30) Issues and resulted in covering the same section of the city only one day in each four (4); that no copies of the Clark County News were distributed by mail.

"V. That the publisher of the Clark County News had no mailing permit permitting the distribution of the Clark County News by mail during the time the Clark County News was printing the proposed city charter.

"VI. That at the time the Clark County News was distributed as set out in Paragraph IV. there were not more than one thousand (1,000) copies of the newspaper distributed each day; that at that time there were approximately fourteen thousand five hundred (14,500) homes or home units occupied in Vancouver as established by the records of the Public Utility District for the area within the City."

Paragraph VII of the agreed statement of facts admits that, unless the charter was legally adopted, the seven councilmen are not legally elected or appointed and are not qualified to act as such officials.

Paragraph IX thereof states that the proposed charter was published in thirty issues of the Vancouver Columbian, a daily newspaper, and that wide and general publicity was given to the charter proposition by way of radio programs, newspapers stories and articles in both local newspapers

and in the Oregon Journal and Oregonian, newspapers published in Portland, Oregon, but with general circulation in Clark county.

As I see it, the constitutional question arising from the agreed statement of facts was substantially settled in 1892 in *Wade v. Tacoma*, 4 Wash. 85, 29 Pac. 983. There the city had adopted a charter in compliance with Art. XI, § 10, of the constitution. In it there was a provision for amending it by adoption of a resolution declaring the council's intention to submit the proposed amendment to the voters and by causing it to be published for thirty days *in the official newspaper*. This procedure was followed. The plaintiff taxpayer instituted an action to enjoin the operation of the amendment. The city urged that publication of the proposed amendment in the one newspaper was sufficient, because an amendment was not governed by the same constitutional provisions as an original charter. In holding that the provisions of Art. XI, § 10, applied to amendments as well as to charters, and that this amendment was not legally adopted, this court said:

"It may well be presumed that the constitution makers intended to guarantee to the citizens of cities as full and complete a notice of the amendments to charters as of the original charters. In fact there is no reason why they should not. There is no difference in the effect or operation of charter laws because one happens to be in the original charter adopted and the other an amendment to such original charter. The amendment may effectually supplant or destroy the original charter and institute a new policy altogether. It is urged by the respondent that the notice provided by the charter and under which the city acts is sufficient. That is probably true, and it is probably true that it would have been a sufficient notice in *fact* if the *original* charter had been published for thirty days in the official newspaper of the city; *but the trouble is that it is not the notice prescribed by the constitution, and although other modes in the opinion of this court might be equally, and even more, efficacious, such considerations can have no weight in determining this question.* Without entering into an extended analysis of this section we are satisfied that the contention of the appellant *is warranted by the*

*plain and natural construction of the constitution.*" (Italics mine.)

The majority opinion does not even mention this decision. In my opinion, until it is overruled or distinguished, it must be followed in the present case and the judgment of the trial court reversed.

The *Wade* case is referred to in *State ex rel. Linn v. Superior Court,* 20 Wn. (2d) 138, 146 P. (2d) 543 (cited by the majority), but nothing there said in reference to Art. XI, § 10, of the constitution in any way impairs the effectiveness of our decision in the *Wade* case.

*State ex rel. Billington v. Sinclair, supra,* has no bearing upon our problem, because the sufficiency of the publication of the city charter involved, as required in Art. XI, § 10, was not discussed at all.

As indicated above, the issue involved in this case is of much greater importance than the question whether cities of twenty thousand or more population having only one daily newspaper may adopt a charter. The real issue is whether the people of this state are to continue to have constitutional government at all. In other words, is the right to amend the constitution which the people reserved to themselves to be usurped by the courts because they consider their hindsight more practical than the foresight of the framers of the constitution in 1889?

Respondent argues that, if the framers had foreseen in 1889 that in 1952 very few cities of twenty thousand or more population would have two daily newspapers, they would have provided for publication of the proposed charter by one such paper or for some other method of publication. No doubt this is true, but it does not follow that the courts may disregard the plain mandatory provision of the constitution and speculate as to what the framers would do now if they were proposing a constitution today. The right of amendment resides solely in the legislature and the people as provided in Article XXIII. No matter how inconvenient or cumbersome or impossible of compliance the procedure may be, the courts must accept and enforce the constitution

as written until it is amended by the legislature and the people.

A similar situation arose in *State ex rel. Troy v. Yelle,* 27 Wn. (2d) 99, 176 P. (2d) 459, 170 A. L. R. 1425, which involved an attempt to circumvent the constitutional provision fixing the limits of the salaries of certain state officers. These salaries which had been fixed in 1889 had become woefully inadequate by 1945, and the legislature then attempted to remedy the situation by creating a commission on interstate co-operation and providing for additional compensation for the same state officers as members thereof. In holding that the only recourse available to the state officers was to persuade the people to amend the constitution so as to remove these salary limitations, we said:

"But even though we should find, in this case, that the additional duties imposed on these officers by the act in question are extrinsic and foreign to the duties otherwise required of them, and that the legislation was enacted for the purpose of forming the commission, rather than to raise salaries, the act would still contravene the constitution. The people themselves, by placing §§ 16, 17, 19, 20, 21, and 22 of Art. III in the basic law, stated definitely and positively that the salaries of state officers could be raised so high and no higher. In addition to stating that the compensation (not salary) for state officers shall not be increased or diminished during the term for which they have been elected, the people have placed a distinct limitation, as to each of the officers, on the amount of salary each may receive. For instance, as to the superintendent of public instruction, Art. III, § 22, says: 'He shall receive an annual salary of twenty-five hundred dollars, which may be increased by law, *but shall never exceed four thousand dollars per annum.*' (Italics ours.) The people realized that the duties of the superintendent of public instruction might be increased from time to time and gave the legislature authority to raise the salary, but placed an absolute limit on it of four thousand dollars per annum. There are similar salary limitations placed against each state officer with the exception of the commissioner of public lands. *We may agree that the people, in framing the constitution, did not contemplate inflation or high prices. But the only recourse which relators have is to go to the people themselves for relief, and not to the legislature or the courts.*" (Italics mine.)

As a result of this decision, the constitution was amended, and the hardship on the state officers was eliminated. See amendment 20, now Art. XXVIII, § 1, of the constitution, which amended certain sections of Art. II and Art. III. The same procedure should be followed with regard to Art. XI, § 10, if the procedure for the adoption of charters by cities having twenty thousand or more population is to be simplified.

We recently disposed of a similar plea for a judicial amendment of the constitution in *State ex rel. Lemon v. Langlie,* 45 Wn. (2d) 82, 273 P. (2d) 464, with this statement:

"The vice of this reasoning is that it destroys the usefulness and the very purpose of a written constitution. The function of a state constitution under our form of government is well stated in 11 Am. Jur. 651, Constitutional Law, § 44, as follows:

" 'A written Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it. No function of government can be discharged in disregard of, or in opposition to, the fundamental law. The state Constitution is the mandate of a sovereign people to its servants and representatives. No one of them has a right to ignore or disregard its mandates; and the legislature, the executive officers, and the judiciary cannot lawfully act beyond the limitations of such Constitution.'

"If it be a fact that public convenience and administrative efficiency can be promoted by maintaining the thirteen state agencies at Seattle or elsewhere than at the seat of government, the constitution may be so amended by majority vote of the people. They have reserved to themselves the sole power to change our state constitution. What we said in *State ex rel. Banker v. Clausen,* 142 Wash. 450, 253 Pac. 805, quoting with approval from 6 R.C.L. 46, is applicable to the present case:

" ' "A cardinal rule in dealing with constitutions is that they should·receive a consistent and uniform interpretation, so that they shall not be taken to mean one thing at one time and another thing at another time, *even though the*

*circumstances may have so changed as to make a different rule seem desirable.* In accordance with this principle, a court should not allow the facts of the particular case to influence its decision on a question of constitutional law, nor should a statute be construed as constitutional in some cases and unconstitutional in others involving like circumstances and conditions. Furthermore, *constitutions do not change with the varying tides of public opinion and desire.* The will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and therefore the courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of its founders." ' (Italics ours.)

"Accordingly, we are bound by the mandatory language of Article III and Article XIV of the constitution as adopted by the people in 1889 until such time as the people see fit to exercise their sovereign right to change it."

There are numerous decisions from other courts of last resort holding that changing economic conditions do not warrant judicial amendment of the constitution:

*Straughan v. Coeur D'Alene,* 53 Idaho 494, 24 P. (2d) 321.

*Louisville v. Presbyterian Orphans Home Society, etc.,* 299 Ky. 566, 185 S. W. (2d) 194.

*State ex rel. Bruestle v. Rich,* 159 Ohio St. 13, 110 N. E. (2d) 778.

*State v. King,* 262 Wis. 193, 54 N. W. (2d) 181.

In the last cited case, it was said:

"If and when it appears to the people that a constitutional inhibition or restraint is objectionable or that changed social, economic, or political conditions require departure from what has been considered to be necessary for the protection and preservation of formerly recognized rights or the imposition of new obligations the means of eliminating or adding are adequately provided by the constitution itself. The refusal of the court to usurp the power reserved to the people themselves to amend the fundamental law does not place the people nor their representatives in a strait jacket, helpless to adapt the law to their needs or wishes.

"The fact that time may be consumed and delay, possibly costly, may result from the necessity for permitting the people to exercise their exclusive right to amend the constitution or that there may in some instances be other considerations of expediency which would suggest un-

authorized action by the court, does not permit us to arrogate to ourselves that power. The results of orderly procedure, if they appear to be objectionable, can easily be obviated if the people find it necessary or desirable to submit to the consequences of their elimination. The heads of dictatorial governments have not been hampered in that regard. *Until the people express a willingness to submit to the evils of that form of government the court should confine its operations and activities to those delegated to it, and in compliance with the oaths of its members, so function as to aid them in the preservation of the rights and the limitations expressed in the constitution."* (Italics mine.)

The court of appeals of Maryland, in disposing of the argument that it give great weight to contemporaneous construction of an ambiguous constitutional provision, said in *Johnson v. Duke,* 180 Md. 434, 24 A. (2d) 304:

"The doctrine is based upon the assumption that the contemporaries of the framers have claims to our deference on the question of interpretation, inasmuch as they enjoyed the best opportunities of learning the intention of the framers and the understanding of the people who ratified the instrument. *Ogden v. Saunders,* 12 Wheat. 213, 290, 6 L. Ed. 606, 632. But it is equally well settled that contemporaneous construction should be resorted to with caution and reserve, and can never be allowed to enlarge, restrict, or contradict the plain meaning of the text. Black, Interpretation of Laws, sec. 31. *It is the sacred duty of the courts to preserve inviolate the integrity of the Constitution.* Hence it would be a violation of their duty to treat the fundamental law as subject to modification except in conformance with constitutional methods. *McPherson v. Blacker, Secretary of State,* 92 Mich. 377, 52 N. W. 469, 472, 16 L. R. A. 475, 31 Am. St. Rep. 587. Failure to exercise a power expressly granted by the Constitution does not destroy that power. In order that the doctrine of practical construction can be applied by the court, the construction must not result in any unconstitutional usurpation." (Italics mine.)

The warning sounded by George Washington in 1796 in his Farewell Address as to the evils resulting from disregard of the people's right to amend the constitution, is still applicable to every republican form of government. He said:

"If in the opinion of the people the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the Constitution designates. But let there be no change by usurpation; for though this in one instance may be the instrument of good, *it is the customary weapon by which free governments are destroyed.*"   (Italics mine.)

If we are to have a government of laws and not of men, the constitution as presently written must be applied to this case. It has been said (*Wells v. Bain,* 75 Pa. St. 39; 15 Am. Rep. 563) that there are only three methods of changing the constitution:   (1) by amending it as provided therein, (2) by a convention called in the manner prescribed therein, and (3) by revolution. This court has now sanctioned a fourth method, to wit, by judicial interpretation.

Numerous courts of last resort, in passing upon the validity of attempts to amend their respective state constitutions or city charters, have held that the method prescribed therein must be faithfully followed. Several of these courts cited and followed Cooley, Constitutional Limitation (4th ed.) 94-95 (now found in his 8th edition at page 159), in which the learned author stated:

"But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not therefore to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the

sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, *there is at least a strong presumption that the people designed it should be exercised in that time and mode only*; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication." (Italics mine.)

Among the decisions referred to are:

*State ex rel. Wood v. Tooker,* 15 Mont. 8, 37 Pac. 840
*Varney v. Justice,* 86 Ky. 596, 6 S. W. 457
*McBee v. Brady,* 15 Idaho 761, 100 Pac. 97
*Oakland Paving Co. v. Hilton,* 69 Cal. 479, 11 Pac. 3
*Collier v. Frierson,* 24 Ala. 100
*Livermore v. Waite,* 102 Cal. 113, 36 Pac. 424
*McCreary v. Speer,* 156 Ky. 783, 162 S. W. 99
*People v. Gunn,* 85 Cal. 238, 24 Pac. 718
*Koehler & Lange v. Hill,* 60 Iowa 543, 14 N. W. 738
*In re Board of Equalization,* 24 Colo. 446, 51 Pac. 493
*Herman v. Oconto,* 100 Wis. 391, 76 N. W. 364
*State ex rel. Fleck v. Dalles City,* 72 Ore. 337, 143 Pac. 1127
*In re McConaughy,* 106 Minn. 392, 119 N. W. 408
*State ex rel. City of Dexter v. Gordon,* 251 Mo. 303, 158 S. W. 683
*State v. Patterson,* 98 N. C. 660, 4 S. E. 350

It would unduly extend this already overly long dissenting opinion to quote the many portions of the cited decisions which are directly in point on the proposition that the mandatory provisions of a state constitution relative to its amendment must be strictly followed. An example is found in the last case cited above, in which the supreme court of North Carolina said:

"More particularly, for the present purpose, when the Constitution prescribes and directs in terms, or by necessary implication, that a particular power shall be exercised in a specified way, or a particular thing shall be done by a particular co-ordinate branch of government—as the Legislature—or by a particular officer or class of officers, and prescribes the way and manner of doing it—such direction

cannot be disregarded—a due observance of it is essential, because the Constitution so provides, and its provisions are not in vain or of trifling moment. It is not of the nature of constitutions of government to provide non-essentials—useless unimportant details—such as may be disregarded and dispensed with. As we have said, they are organic—made upon solemn consideration by the sovereign authority, and contain general, essential provisions—details are avoided, unless deemed important—essential. Non-essential details are left to the discretion of those who exercise and administer the powers of government. If this were not so, why prescribe the way and manner? Why not leave these things to convenience and the authority charged with the exercise of the power? Why direct them? Why restrict them? And if such directions may be disregarded, ignored, suspended in some respects, then to what extent and in what respects? If one co-ordinate branch of the government, or one class of officers, may do so, why may not another, and all, as to duties devolved upon them respectively directly by the Constitution?

"The answer to these and like questions must be, that requirements of the Constitution shall prevail and be observed; and when it prescribes that a particular act or thing shall be done in a way and manner specified, such direction must be treated as a command, and an observance of it essential to the effectiveness of the act or thing to be done. Such act cannot be complete—such thing is not effectual until done in the way and manner so prescribed."

The majority opinion holds that the words "daily newspaper" are unclear and ambiguous, and that the court must construe their meaning. I can see no need for construction. During the sixty-five years since the constitution was adopted, the format, content, and the total number of daily papers in the state may have changed, but their essential features have not changed. Among these are regular subscribers and purchasers on the street and at newsstands, or, in other words, general circulation. In order to serve its subscribers, a newspaper must be delivered either by carrier or through the mail or by both these means.

The essential reason for requiring publication of the proposed charter in two daily newspapers was that it would be available to *two* sets of regular subscribers and purchasers

and thus reach more voters of the city than by publication in only one daily newspaper.

As this court observed in *Times Printing Co. v. Star Publishing Co.,* 51 Wash. 667, 99 Pac. 1040, the courts, in construing statutes relating to publication of official city notices, assume the implied qualification that the paper has a general circulation.

The facts, as stipulated here, show that the "daily edition" of the Clark County News, a weekly newspaper, had no circulation at all. No carriers were employed to deliver it to any regular subscribers, because it had no subscribers. It was barred from the mails. No copies were sold on the street or at newsstands. Therefore, it lacked the essential feature of all newspapers, to wit, general circulation.

The artificial means employed to distribute this "daily edition" of a weekly newspaper by high school students to homes in one fourth of the city of Vancouver each day is no adequate substitute for normal circulation. To hold that this paper was a daily newspaper within the meaning of Art. XI, § 10, of the Constitution during the temporary period of its publication and distribution in the manner set forth in the agreed statement of facts, in my opinion, does violence to the plain and unambiguous language of that section.

Judge Weaver's opinion concurring in the result of the majority opinion, while holding that the constitutional provision is clear and unambiguous, expresses the view that the trial court must be affirmed because we are bound by the agreed statement of facts, wherein it is stated the Clark County News, a weekly newspaper, contracted with the city of Vancouver to issue its newspaper five days per week until it had published the proposed charter in thirty issues, and that the Clark County News distributed its "daily edition" by having it distributed from house to house by high school students in the manner described therein.

While to my mind there is a serious question whether the conclusion stated in a stipulation of facts made between private parties affecting matters of public interest (such as compliance with the constitution) are binding on the courts (see note in 92 A. L. R. 663, 668-671), I pass that question

and consider the language of the agreed statement of facts in this case.

I do not believe that the statement therein that this weekly newspaper "distributed the daily edition of its newspaper" by high school students in the manner described, compels the conclusion that the Clark County News thereby became a daily newspaper during the period that it purported to publish the proposed charter.

During this period, as pointed out above, the Clark County News had no subscribers to its daily edition. It could not be sent through the mail to anyone. It was not sold on the streets or at newsstands. One of the essentials of a newspaper is that it have a general circulation through the usual channels.

The agreed statement of facts, by stating that a weekly newspaper distributed the "daily edition" of its paper by high school students to homes in one fourth of the city each day, does not compel a holding that that procedure is what the people had in mind when, in adopting the constitution, they required publication of the proposed charter in two daily newspapers. One essential attribute of a newspaper is that it have a general circulation by carrier and by mail to regular subscribers in addition to being sold on the streets and at newsstands.

I cannot agree that we are bound to hold that the Clark County News was a daily newspaper merely because the agreed statement of facts states the anomalous conclusion that this weekly newspaper distributed its "daily edition" during the period in question in the manner described therein.

While the majority opinion expressly disavows reliance upon the substantial compliance doctrine in interpreting the constitutional provision before us (a doctrine which is applicable *only to statutes*), the effect of the opinion is to do that very thing. The mention of the publicity given to the proposed charter by radio, by Portland daily papers and speeches to local organizations, clearly shows that the opinion is based largely on the doctrine of substantial compliance.

I cannot find any basis for the majority opinion except that inapplicable doctrine. The last paragraph thereof clearly holds that the Clark County News was a daily newspaper during the time it was publishing the proposed charter and distributing it in the manner previously described, and, therefore, the opinion concludes that such publication, together with the publication in the Columbian, a daily paper, constituted a compliance with Art. XI, § 10, requiring publication in two daily newspapers. The opinion then states:

"We are reassured in this conclusion by the fact that widespread publicity was also given to the proposed charter by radio, by articles in the large dailies of the Portland, Oregon, metropolitan district, by speeches and discussion in local, civic and community clubs."

If the substantial compliance doctrine was *not* relied upon (as the opinion previously stated), why mention radio talks, Portland newspapers, and speeches in local clubs? There is no statement in the agreed statement of facts that the contents of the proposed charter were communicated *verbatim* to the voters by any of these means. If the manner of publication in the two papers mentioned did not comply with Art. XI, § 10, these other means of communication could not cure the defect.

With due deference to the views of the majority, I cannot see how this result can be viewed as anything but an attempt to amend the provisions of Art. XI, § 10, of the constitution, by applying the doctrine of substantial compliance to the mandatory requirements thereof for the publication of the proposed city charter. This is a prerogative which the people have reserved to themselves in Art. XXIII. As stated above, the courts must apply the mandatory provisions as written, no matter how inconvenient, cumbersome, or even impossible, it may be to comply with them.

The language of Judge Huston of the Idaho supreme court in his concurring opinion in *People ex rel. Lincoln County v. George*, 3 Idaho 72, 26 Pac. 983, is applicable to the problem before us:

"No better rule, it seems to me, can be found for the

guidance of courts in the decision of these cases than that expressed by Chief Justice Bronson in *Oakley v. Aspinwall,* 3 N. Y. 547. Says that learned jurist in his opinion in that case: 'It is highly probable that inconveniences will result from following the constitution as it is written. But that consideration can have no force with me. It is not for us, but those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves, or if, under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set any boundary to the powers of the government. *Written constitutions will be more than useless.* Believing, as I do, that the success of free institutions depends upon a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for latitudinarian constructions which are resorted to for the purpose of acquiring power; some evil to be avoided, or some good to be attained by pushing the powers of the government beyond their legitimate boundary. *It is by yielding to such influence that constitutions are gradually undermined, and finally overthrown.* My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. *But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal.* One step taken by the legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow; and so the process goes on until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.' Says Judge Cooley, in his work on Constitutional Limitations, fifth edition, page 86, note; 'We agree with the supreme court of Indiana (*Greencastle Tp. v. Black,* 5 Ind. 557, 565), that in construing constitutions courts have nothing to do with the argument *ab inconvenienti,* and should not bend the constitution to suit the law of the hour.' " (Italics mine.)

In the present case, the majority has approved a method of publication of the proposed charter which does not comply with Art. XI, § 10, because it holds that the method

employed by the city of Vancouver was substantially as effective as the constitutional method. Even though the method pursued actually was a more effective means of publicity than the constitutional method, it would still be invalid. Under the authorities cited herein, the majority may not substitute its judgment as to the sufficiency of the publication for that of the people as expressed in their constitution. It has been said that every journey to a forbidden end begins with the first step. In this instance, the only logical end of ignoring the constitutional mandate is anarchy.

The final question before us for decision is whether the trial court abused its discretion in refusing to order respondent, as prosecuting attorney of Clark county, to institute a *quo warranto* proceeding as prayed for in the petition. *State ex rel. Winters v. Steele,* 37 Wn. (2d) 434, 224 P. (2d) 332.

For the reasons stated herein, it is my opinion that it plainly appears that the trial court did abuse its discretion in refusing to order respondent, as prosecuting attorney of Clark county, to institute an action in the nature of *quo warranto*. Consequently, the order of dismissal should be reversed and the trial court directed to enter an order in accordance with the prayer of appellant's petition.

SCHWELLENBACH, J., concurs with DONWORTH, J.

HILL, J. (concurring in Judge Donworth's dissent)—While I disagree with the majority, and concur in the result of Judge Donworth's dissenting opinion and agree with much if not all that is said therein, I desire to make it clear that I do not see any substantial breach in the bulwark of constitutional government in the majority opinion. We are simply confronted with an obsolete legislative provision which should never have been placed in our state constitution and which makes impossible the adoption of a "home rule" charter by many of our cities. The fundamental principles on which our government rests are not imperiled. The constitutional provision with which we are here concerned is no more sacrosanct than any other piece of pro-

cedural legislation; its inclusion in our constitution merely makes it more difficult to get rid of. As a statute, it would govern until repealed; as a constitutional provision, it governs until deleted by amendment.

I agree with Judge Donworth that there has been no compliance with the requirement that a proposed charter

" . . . shall be published in *two daily newspapers published in said city*, for at least thirty days prior to the day of submitting the same to the electors for their approval. . . ." (Italics mine.)

HAMLEY, C. J., concurs with HILL, J.